Patrick C. ABOOD, Appellant/Cross–Appellee,

v.

Kimberly I. ABOOD n/k/a Kimberly I. Farnsworth, Appellee/Cross–Appellant.

Nos. S–11154/11173.

Supreme Court of Alaska.

Sept. 2, 2005.

---

**49.** *Id.* at 519.

**50.** *Id.*

Janet D. Platt, Law Offices of Janet D. Platt, Anchorage, for Appellant/Cross–Appellee.

R. Scott Taylor, Sonosky, Chambers, Sachse, Miller & Munson, LLP, Anchorage, for Appellee/Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Patrick and Kimberly Abood both appeal aspects of the property division accompanying their divorce. We affirm. We conclude that the superior court did not clearly err in finding that settlement proceeds paid to Kimberly during the marriage for personal injuries she received about five years before the marriage were not transmuted into marital property. We also conclude that the superior court did not clearly err in finding that the marital home was transmuted into marital property even though Kimberly was not on the title and Patrick had purchased the home before they married. We conclude that the superior court did not clearly err in finding that the $174,814 increase in value of Patrick's street sweeping business was marital because it was the result of active appreciation. We conclude that the superior court did not abuse its discretion in assigning a recapture value of a marital vehicle Kimberly sold before trial, or by not dividing the value of a set of tires and rims from that vehicle. We also conclude that the court did not abuse its discretion in characterizing the 2001 federal income tax refund as Patrick's separate property.

## II. FACTS AND PROCEEDINGS

Kimberly and Patrick married in 1994. They neither had nor adopted children. Kimberly and Patrick separated, and Patrick petitioned for divorce in 2002. At the time of trial, Kimberly was forty years old and one semester away from earning her second master's degree. Patrick was forty-six and owned and operated a successful street-sweeping business, Knik Sweeping. The superior court granted the divorce and distributed the property. Patrick and Kimberly both appeal aspects of the property division.

One dispute concerns personal injury settlement proceeds Kimberly received during the marriage to compensate her for injuries she received before the marriage. Kimberly had been the victim of a 1989 vehicular accident in which she sustained serious injuries that continue to plague her and may require further surgery. She sued General Motors for her injuries and settled with GM in 1999, receiving net proceeds of $1.6 million. This money was deposited into Patrick's business and personal checking account. Two months later the parties placed the $1.6 million, along with another $300,000 in marital funds, in five Merrill Lynch joint Cash Management Accounts (CMAs) with rights of survivorship. The superior court found that the proceeds from the settlement remained Kimberly's separate property, but that the $300,000 contribution was marital.

Another dispute concerns the superior court's characterization of the home as marital property. In 1993 Patrick bought the house that the couple shared before and during the marriage. Several improvements were made to the house before and during the marriage. The parties stipulated to its value but disputed whether it should be categorized as marital or as Patrick's separate property. The superior court found that the house had been transmuted into marital property.

The parties dispute the division of Patrick's business, Knik Sweeping. At the time of trial, Patrick operated Knik Sweeping as a sole proprietorship and used the business checking account as his all-purpose business

and personal account. Patrick purchased equipment during the marriage with funds from that checking account. The superior court found that the equipment acquired during the marriage was marital property and, alternatively, that the business's increase in value was marital property through active appreciation.

After the parties separated, Kimberly traded in her Mercedes–Benz for a new Jeep. Kimberly agrees that the Mercedes–Benz was marital property and that she received less than fair market value for it, but the parties dispute the amount to be recaptured. The superior court did not rule on Patrick's request that it charge Kimberly with the value of a set of Mercedes–Benz rims and tires that she traded for an extended warranty on the Jeep.

Patrick and Kimberly filed a joint tax return in 2001, the last full year of their marriage. After they made payments from marital funds, Patrick used his post-separation earnings to make a Simplified Employee Pension Plan (SEP) contribution for 2001, reducing the couple's tax liability for that year. The superior court found that the resulting tax refund was Patrick's separate property.

## III. DISCUSSION

### A. Standard of Review

■ The equitable division of marital assets involves a three-step procedure. First, the superior court "must determine what specific property is available for distribution." [1] Next, it must find the value of this property.[2] Finally, it must determine "how an allocation can be made most equitably." [3]

■ The superior court has broad discretion in fashioning the property division in a divorce case.[4] We review the superior court's determination of the availability of property for distribution for abuse of discretion.[5] We review the superior court's factual findings for clear error.[6] Likewise, a finding that the parties intended to treat property as marital will be disturbed only if it is clearly erroneous.[7] A finding of fact is clearly erroneous when the reviewing court is left with a definite and firm conviction that the trial court has made a mistake.[8]

### B. The Product Liability Settlement Proceeds

■ Kimberly received $1.6 million in a 1999 settlement with General Motors following the 1989 vehicular accident in which she suffered serious, long-term injuries. The superior court found that the settlement funds remained Kimberly's separate property. Patrick argues that the settlement funds were transmuted into marital property when they were deposited into jointly owned brokerage accounts. Because we discern no clear error in the superior court's finding, we affirm.

■ Transmutation is the process by which one spouse's separate property becomes marital property, and "occurs when a married couple demonstrates an intent, by virtue of their words and actions during marriage, to treat one spouse's separate property as marital property." [9] Commingling separate property with marital property does not automatically lead to a finding of transmutation.[10] But placing property in joint title raises a presumption of transmutation.[11]

1. *Green v. Green*, 29 P.3d 854, 857 (Alaska 2001) (quoting *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983)).

2. *Id.*

3. *Id.*

4. *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994).

5. *Green*, 29 P.3d at 857.

6. *See, e.g., Leis v. Hustad*, 22 P.3d 885, 887 (Alaska 2001) ("Property value determinations are factual decisions that we will overturn only if there is clear error.").

7. *Cox*, 882 P.2d at 913.

8. *Dingeman v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993).

9. *Schmitz v. Schmitz*, 88 P.3d 1116, 1125 (Alaska 2004); *see also* BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.24, at 277 (2d ed.1994).

10. *Brown v. Brown*, 947 P.2d 307, 311 (Alaska 1997).

11. *Leis*, 22 P.3d at 888 (quoting *Chotiner v. Chotiner*, 829 P.2d 829, 833 (Alaska 1992)).

Patrick argues that although the funds were initially Kimberly's separate property, a presumption of transmutation arose when she commingled the funds with marital property in Patrick's business checking account and then placed them into the jointly held Merrill Lynch CMAs.

Kimberly testified that the parties chose not to segregate the settlement proceeds from other funds within the CMAs for administrative convenience, to obtain better money managers, and to receive better brokerage rates. The rationale of better brokerage rates was disputed at trial, but there was evidence that the Aboods were able to obtain money management for the marital funds that would have been unavailable without combining them with Kimberly's settlement proceeds.[12]

We have held that evidence of administrative convenience may rebut the presumption of transmutation.[13] In anticipation of the personal injury settlement, the Aboods consulted their neighbor, broker Margaret Price, but did not ultimately fund an account with her, choosing instead to invest through Merrill Lynch. Price testified that the Aboods wanted the money "to be invested and to grow in value for the future." Price also testified that Kimberly spoke to her about a separate account and that they decided to create a joint account as "a matter of convenience," and that "they thought that it would just be easier to do the investments together, rather than to do separate pots of money." Kenneth Jones, the couple's financial advisor at Merrill Lynch, similarly testified that the Aboods wanted to save their money "for the long term."

■ The nature of the personal injury settlement is also relevant. We have held that "the purpose for which the [tort] recovery is received controls its classification."[14]

If the recovery is compensation for non-economic damages, the settlement is separate property of the claimant spouse.[15] This principle recognizes the intensely personal nature of these sorts of injuries,[16] and suggests that courts should be hesitant to find that a recipient intended to donate to the marriage the funds that she received in compensation for her injuries. Kimberly testified that the settlement was intended to compensate her for her physical injuries, which were described in detail in *General Motors Corp. v. Farnsworth*.[17] Thus, the personal nature of the settlement funds supports the superior court's conclusion that Kimberly did not intend to donate her personal property to the marriage.

■ Kimberly testified that the funds were invested to provide for her future medical needs. This testimony reflects an intent to retain the funds as separate property. Patrick argues that setting aside money for Kimberly's future medical expenses was an investment for a marital purpose and indicates an intent to treat the funds as marital property. But this contention, absent evidence of an intent to benefit the marriage, is not so persuasive that the superior court was obliged to accept it. The potential for future medical expenses results from the discrete, premarital event for which Kimberly received the settlement money. Because Kimberly will incur future medical expenses attributable to the accident regardless of her marital status, the superior court could properly find a lack of intent by Kimberly to donate the settlement funds to the marriage. Kimberly's medical expenses not covered by insurance were paid out of marital funds and were not "reimbursed" with settlement funds. But the use of marital funds to pay a spouse's ongoing medical expenses does not

---

12. *Cf. Gardner v. Harris*, 923 P.2d 96, 99–100 (Alaska 1996) (approving separate characterization of bonds transferred to marital account for joint account and used to obtain better financing for marital property).

13. *See Julsen v. Julsen*, 741 P.2d 642, 646–47 (Alaska 1987) (holding that inherited stock remained separate because it was placed in joint trading account only "as an administrative convenience" and non-owner spouse did not participate in account management).

14. *Bandow v. Bandow*, 794 P.2d 1346, 1348 (Alaska 1990).

15. *See id.* at 1349.

16. *Id.*

17. *Gen. Motors Corp. v. Farnsworth*, 965 P.2d 1209, 1212 (Alaska 1998).

compel a finding that the spouse intended to donate to the marriage the separate settlement proceeds the receiving spouse testifies were set aside to pay for future medical expense attributable to the premarital injury.

Patrick argues that the superior court erred in according weight to Kimberly's trial testimony that she intended to preserve the settlement funds as separate property and that she assumed Patrick knew of this intent. We have said that, in attempting "to give effect to the intention of the parties, looking to their testimony as to their subjective intentions or understandings will *normally* accomplish no more than a restatement of their conflicting positions."[18] Thus, self-serving testimony is ordinarily not probative.[19] But we have not foreclosed the consideration of trial testimony of prior intentions in all circumstances. Here, the circumstances and purposes of the settlement corroborate Kimberly's testimony. Furthermore, "[i]t is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[20] It was not error for the superior court to credit this testimony.

Patrick also argues that withdrawals from the CMAs for marital purposes and the use of the CMAs to secure a margin loan that was used for marital purposes demonstrate that Kimberly intended to treat the settlement funds as marital. The superior court found that the withdrawal came out of the remaining portion of the $300,000 marital fund contribution to the CMAs, and declined to find that the use of the CMAs to secure the margin loans converted the settlement funds into marital property.

■ The superior court's finding that the withdrawals came from marital funds was the logical result of the finding that the CMAs contained both marital and separate funds. Withdrawals for marital purposes from accounts that contain funds from both separate and marital sources are not inconsistent with the continued existence of both separate and marital property in the accounts.[21] The superior court's finding that the withdrawals came out of marital funds was not clearly erroneous.[22]

We considered the effect of using separate property to secure margin loans for marital purposes in *Gardner v. Harris*.[23] We held there that this use did not automatically transmute the separate property into marital property.[24] Patrick argues that *Gardner* is inapposite here because the property in *Gardner* was bonds, whereas here the property is "fungible" money. This argument is without merit. As we will see below, funds in the CMAs are traceable to Kimberly's separate settlement funds. Because a fact finder can distinguish between funds attributable to the settlement proceeds and funds from other sources within the jointly held CMAs, we discern no meaningful distinction between the funds in this case and the "corpus" of the bonds in *Gardner*.

Nor did Patrick's participation in research into investment options and limited direction of investments compel a finding that Kimberly intended to treat the settlement funds as marital property. Rather, Patrick's participation in meetings with financial advisors after the funds were invested at Merrill Lynch demonstrates an appropriate involvement in the oversight of the marital funds.

In *Gardner*, the non-owning spouse had more control over the funds than Patrick

---

18. *Day v. A & G Constr. Co.*, 528 P.2d 440, 444 (Alaska 1974) (emphasis added).

19. *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981).

20. *Knutson v. Knutson*, 973 P.2d 596, 599–600 (Alaska 1999).

21. *Compare Gardner v. Harris*, 923 P.2d 96, 97 (Alaska 1996) ("The parties there both 'made credit card transactions and wrote checks against the account; they each contributed their paychecks to the account; and they applied the bond's interest income ... toward joint expenses.' ").

22. *See* TURNER, *supra* note 9, § 5.23, at 271 ("If the funds were used to purchase an asset for a marital or family purpose, they probably came from the marital portion of the mixed source.").

23. *Gardner v. Harris*, 923 P.2d 96, 97 (Alaska 1996).

24. *Id.* at 100 ("Until the credit was used the bonds remained Harris's separate property. When the bonds were called, however, the portion that was used for credit was lost, and the remaining proceeds remained Harris's separate property.").

could exercise here.[25] Furthermore, Kenneth Jones testified that he would regularly recommend strategies that Kimberly and Patrick would then approve. This is not active management by Patrick that would compel a finding of transmutation.[26] We therefore cannot say that the superior court's finding that Kimberly did not intend to treat the settlement funds as marital property was clearly erroneous.

■■■■■ But even property that the owner intended to remain separate may be marital if it is inextricably commingled with marital property.[27] We must therefore determine whether the disputed Merrill Lynch funds were traceable to the settlement check. When classifying secondary assets, "courts 'must first identify the specific asset from which it was derived (the source asset), and then determine the classification of that asset.' "[28] When the source asset is also secondary property, tracing continues until either a separate or a marital primary source asset is found.[29] Separate property may be traceable to its separate source despite being mixed with marital property in the same secondary asset.[30] To characterize a mixed secondary asset, the superior court must determine the character of each source asset and the amount of value each source contributed to the mixed whole.[31] "The marital and separate interests in a mixed secondary asset are ordinarily in the same ratio as the marital and separate contributions used to acquire the asset."[32]

The funds in the Merrill Lynch CMAs were deposited in a single transaction from Patrick's checking account. The checking account was a mixed asset, containing both the settlement funds and marital proceeds from Knik Sweeping. The $1.9 million transferred from the checking account to the CMAs consisted of $1.6 million from Kimberly's settlement check from GM and $300,000 in marital funds already in the checking account. The funds in the Merrill Lynch CMAs were therefore readily traceable to primary separate and marital sources. The contribution ratio dictates that 16/19 of the CMA funds are Kimberly's separate property and 3/19 of the CMA funds are marital property.

Patrick argues in passing that $76,000 of the $300,000 transferred from the Knik Sweeping checking account to the Merrill Lynch CMAs is his separate property. The $76,000 was transferred into the Knik Sweeping checking account shortly before the $1.9 million was transferred to the Merrill Lynch CMAs. Patrick testified that the $76,000 was attributable to his separate property, but did not demonstrate that it was deposited in the CMAs or that he intended to maintain it as separate property after placing it under joint title. The superior court therefore did not clearly err in finding the entire $300,000 to be marital property.

Likewise, the superior court did not clearly err in finding that Kimberly did not intend to transmute the settlement proceeds into marital property. We therefore affirm its finding that the settlement funds remained Kimberly's separate property.

## C. The Marital Home

■■■■ Patrick bought the marital home before the marriage without any contribution from Kimberly, and made several improvements. The superior court found that the house was transmuted into marital property. Patrick argues that the superior court erred in finding that he intended to donate the home to the marriage.

25. *Gardner*, 923 P.2d at 97 ("both [parties] possessed independent authority over [the] account, including individual discretion over whether to trade or cash in the VMT bonds."). Here, however, the permission of both spouses was needed to withdraw funds from the CMAs.

26. *See id.* at 99.

27. *Schmitz v. Schmitz*, 88 P.3d 1116, 1128 (Alaska 2004) ("[U]ntraceable assets are marital property.") (citing TURNER, *supra* note 9, § 5.23, at 266).

28. *Id.* at 1127–28 (quoting TURNER, *supra* note 9, § 5.23, at 263).

29. *Id.* at 1128.

30. *Id.*

31. *Id.*

32. *Id.* (internal quotation omitted).

■ We have enunciated four factors for determining whether real property is transmuted into marital property:

> (1) the use of the property as the parties' personal residence, and (2) the ongoing maintenance and managing of the property by both parties, as well as (3) placing the title of the property in joint ownership and (4) using the credit of the non-titled owner to improve the property.[33]

■ Kimberly does not contend that the house title was placed in joint ownership. Nor was her credit used to improve it. But the first factor is satisfied because the property was used as the couple's home both before and during the marriage. Furthermore,

> so long as the parties do marry, the trial court is free to consider the parties' entire relationship, including any period(s) of premarital cohabitation, in making its property division under AS 25.24.160(a)(4), so long as the court observes the distinction which AS 25.24.160(a)(4) draws between assets acquired prior to and during coverture.[34]

Thus, as long as the trial court recognized that the home was originally Patrick's separate property and that the period of premarital cohabitation is relevant only to Patrick's intent to treat the property as marital, it could have properly considered this period of time in determining Patrick's intent to donate the home to the marriage.

■ We next consider the second factor. To establish ongoing management and maintenance, the non-owning spouse's "participation must be significant and evidence an intent to operate jointly."[35] Participation in "limited maintenance and management tasks" is insufficient,[36] as are minor efforts at remodeling.[37] Past cases have held that transmutation occurs when the non-owning spouse takes an active role in the operation of the property as a business.[38] But the test is applied differently in different circumstances,[39] and where the property at issue is the marital home, different management and maintenance activities may demonstrate an intent to hold the property jointly.[40]

Here, there was evidence of ongoing management and maintenance by both parties. Kimberly testified that "after the marriage we basically tore up the floor boards, tore down the ceilings, did everything from [s]heetrock to Corian counters to new tile in the entryway, new carpeting, paint, new appliances, new lighting fixtures." She also testified that they put in a new shower, windows, and closed the sunroom windows, and that she participated in these improvements. Cleaning and maintenance were also her responsibility. Patrick testified that they made considerable improvements while living in the house and that marital improvements included carpet, paint, sheetrock, and landscaping. As noted above, if parties later marry, a superior court may consider periods of premarital cohabitation when dividing the home.[41] Patrick's appellate characterization

---

33. *Cox v. Cox*, 882 P.2d 909, 916 (Alaska 1994) (internal citations and quotation marks omitted).

34. *Murray v. Murray*, 788 P.2d 41, 42 (Alaska 1990) (internal citation omitted).

35. *Keturi v. Keturi*, 84 P.3d 408, 417 (Alaska 2004) (quoting *McDaniel v. McDaniel*, 829 P.2d 303, 306 (Alaska 1992)).

36. *Brooks v. Brooks*, 733 P.2d 1044, 1054 (Alaska 1987).

37. *Wanberg v. Wanberg*, 664 P.2d 568, 573 & n. 19 (Alaska 1983) (finding testimony that "[t]he only thing I had to do with that, basically, was the remodeling of the Cosmetic Company, and . . . [c]ollecting [rents]" insufficient to establish ongoing management and maintenance).

38. *See Keturi*, 84 P.3d at 417 (non-owning spouse contributed by collecting rent, cleaning between renters, assisting in finding renters, maintaining coin-operated laundry room, partially landscaping property, and borrowing money from parents for mortgage payment); *Wanberg*, 664 P.2d at 572 (non-owning spouse contributed by remodeling, redecorating, entertaining tenants, helping with general maintenance, collecting rents and accounts payable, paying bills, keeping business records, preparing information for accountants, and doing bookkeeping).

39. *Keturi*, 84 P.3d at 417.

40. *See Harrelson v. Harrelson*, 932 P.2d 247, 251–52 (Alaska 1997) (finding intent to hold jointly when wife's name not on title, but she "contributed financially to [the condominium's] construction" and "acted as [husband's] agent for the building of the condominium, making all interior decorating decisions and generally supervising the construction").

41. *See Murray*, 788 P.2d at 42.

of these efforts as "periodic repairs and maintenance" is unconvincing. These projects amount to more than "minor efforts at remodeling," and are consistent with an intent to hold the home jointly.

In arguing that these improvements do not evince an intent to hold the home jointly, Patrick points to the lack of added value to the home above normal market appreciation. This focus would be more appropriate if Kimberly were relying on the doctrine of active appreciation.[42] But especially for a residence, added value is not a requisite for finding an intent to hold the property jointly. Because the superior court could properly find that the house was used as the marital home and that Kimberly's participation in maintaining and managing the home demonstrated an intent to hold the property jointly, its finding that the home was transmuted into marital property was not clearly erroneous.

The concurrence argues that the court should adopt a rebuttable presumption that a separately titled house is transmuted from separate property to marital property when it is "used for a substantial period of time as the marital residence."[43] It is not necessary to reach that issue in this case because we affirm the superior court's finding of trans-mutation. Moreover, the parties have not argued that we should or should not adopt such a presumption for Alaska and the superior court did not apply any such presumption. Because we have not had the benefit of briefing on the issue, the court declines to reach the issue in this case.

### D. The Assets of Knik Sweeping

The superior court found that the equipment purchased during the marriage, valued at trial at $176,925, was marital property. Patrick argues that the equipment is not a "stand-alone" asset, but is "part and parcel" of Knik Sweeping. He therefore argues that it was error to characterize that portion of the equipment purchased during the mar-

riage with marital funds as marital property. Kimberly argues that the superior court's finding rests on a straightforward reading of AS 25.24.160(a)(4). Because we affirm on the alternative grounds adopted by the superior court, with a virtually identical result, we do not address either party's arguments on this point.

■ The superior court alternatively found that the $174,814 increase in Knik Sweeping's value during the course of the marriage was marital property. The doctrine of active appreciation states that when the separate property of one spouse increases in value due to marital effort, the increase in value is marital property.[44] Active appreciation requires findings that (1) the separate property appreciated during the marriage, (2) the parties made marital contributions to the property, and (3) there was a causal connection between the marital efforts and the appreciation.[45] The non-owning party bears the burden of proving the first two elements.[46] If the non-owning party meets its burden, the spouse owning the separate property bears the burden of showing a lack of causal connection between the marital contributions and the property's increased value.[47]

■ Patrick argues that "Kimberly failed to marshal any evidence to demonstrate the value of Knik Sweeping at the inception of the marriage or the value at the time of marital separation" and that she "thus failed to meet her burden of proof to support a finding of active appreciation during the marriage." But Patrick offered evidence of appreciation during the marriage through his business valuation expert Ronald Greisen, who testified that Knik Sweeping was worth $129,485 at the beginning of the marriage and $304,299 at separation. Patrick worked for Knik Sweeping during the marriage. Furthermore, marital funds were used to purchase sweeping equipment during the

---

**42.** See Harrower v. Harrower, 71 P.3d 854, 858 (Alaska 2003) (stating that increase in value of separate property is marital under active appreciation theory if resulting from marital efforts). See discussion infra Part III.D.

**43.** Concurrence at 991.

**44.** Harrower, 71 P.3d at 858.

**45.** Id.

**46.** Id. at 859.

**47.** Id.

marriage. Both the time and funds are marital contributions to the property, satisfying Kimberly's burden.[48] Because Patrick does not argue that there was no causal connection between the marital efforts and the increase in value, the superior court could properly find active appreciation in the amount of $174,814. This is substantially identical to the amount awarded by the superior court.

### E. The 2001 Mercedes–Benz

After the couple separated, Kimberly traded in her 2001 Mercedes–Benz for a 2003 Jeep. She received less than fair market value for the Mercedes–Benz, which the parties agree was marital property. The superior court assigned the Mercedes–Benz its Kelley Blue Book value as of the trial date. Patrick argues that this was error, and that the superior court should have assigned the Mercedes–Benz its value as of September 12, 2002, a date near the trade-in date.

Property generally should be valued as close to the trial date as possible.[49] Recapture is appropriate if a spouse has dissipated or wasted marital property between separation and trial.[50] Recapture is an equitable doctrine, designed to put the parties in the positions they would have been in had the waste not occurred.[51] Kimberly agrees that recapture of some of the Mercedes–Benz's value to the marital estate was appropriate.

Patrick argues that when recapturing the Mercedes–Benz's value, the superior court should have valued the property as of the date of waste.[52] But in this case the Blue Book provides an accurate means of determining the fair market value of dissipated property at the time of trial, when the Mercedes–Benz would have been valued had Kimberly not exchanged it.[53] Using the 2003 valuation leaves Patrick in the same position he would have been in had Kimberly not traded in the Mercedes–Benz.

The superior court did not clearly err in valuing the Mercedes–Benz as of the date of trial rather than as of September 12, 2002.

### F. The Mercedes–Benz Rims and Tires

Patrick argues that the superior court erred in not assigning a value to the extra tires and rims for the Mercedes–Benz. Kimberly testified that she traded them for an extended warranty on her new Jeep after separation and before trial.

Due to a lack of evidence, the court was without a reliable method of valuing the tires and rims. Kimberly testified that the warranty that she received for the rims and tires was worth between $1,000 and $1,200, but her testimony on this point appears to have been very uncertain. Patrick argues that a dealer invoice establishes that the rims and tires were worth $3,180 as of September 12, 2002. But the invoice date suggests that the invoice may not be for the tires and rims in dispute here. There was no indication that the tires and rims in question were in the same condition as the tires and rims documented in the invoice. Patrick offered no testimony about the invoice or the value of the rims and tires. Any value assigned to the tires and rims would be speculative.

A party who fails to produce sufficient evidence may not challenge the inadequacy of evidence on appeal.[54] In *Miles v. Miles*, we

---

**48.** *Schmitz,* 88 P.3d at 1125 (noting that " 'time and energy of both spouses during the marriage is to be considered in dividing marital property' " and holding that neither spouse should "be able to erase his or her contributions of time and energy from the marital estate 'by rolling them back into a business which he began before the marriage.' ") (quoting *Lowdermilk v. Lowdermilk,* 825 P.2d 874, 877–78 (Alaska 1992)).

**49.** *See Ogden v. Ogden,* 39 P.3d 513, 521 (Alaska 2001); *Ogard v. Ogard,* 808 P.2d 815, 819 (Alaska 1991).

**50.** *Foster v. Foster,* 883 P.2d 397, 400 (Alaska 1994).

**51.** *See Ramsey v. Ramsey,* 834 P.2d 807, 809 (Alaska 1992) ("A valuation date should be chosen which will provide the most current and accurate information possible and which avoids inequitable results.").

**52.** *See Foster,* 883 P.2d at 400 ("[T]he court can 'recapture' the asset by giving it an earlier valuation date and crediting all or part of it to the account of the party who controlled the asset.").

**53.** *See also Ramsey,* 834 P.2d at 809 (stating that date of valuation should be "as close as practicable" to date of trial).

**54.** *Hartland v. Hartland,* 777 P.2d 636, 640 (Alaska 1989).

held that when "neither party was able to produce documentation of the actual payments on the property, there is no reason to conclude that the superior court's finding [that the payments at issue held a de minimis value] was clearly erroneous."[55] Patrick produced only an invoice that may not reflect the value of the disputed rims and tires. We therefore conclude that Patrick has not demonstrated that the superior court erred, or that any error harmed him here. We also note that the value was relatively small in comparison with the other assets at issue in this case.[56]

### G. The 2001 Income Tax Refund

Patrick and Kimberly separated on April 11, 2002. They made payments on their 2001 income tax liability from marital funds, and ultimately filed a joint income tax return in October 2002. After the separation but before filing the tax return, Patrick contributed post-separation funds to a personal SEP account. Although he made the contribution in 2002, he applied the deduction to the parties' 2001 tax liability. The IRS issued a tax refund of $8,753, which the superior court found to be Patrick's separate property.

Kimberly argues in her cross-appeal that the refund is the result of payments and deductions attributable to the parties, and that no one factor can be said to have caused the refund, which is therefore marital property. This may be true as a general proposition,[57] but may not always be the case in the divorce context.

▇▇▇ Because marital contributions were inadequate to eliminate liability, the parties still owed federal income tax at the time of separation. Patrick's efforts came after separation and supplemented the marital resources used to satisfy the tax obligation. The reduction in tax liability due to Patrick's SEP contribution eliminated the need for further marital payments and caused pay-ments to exceed liability, resulting in the refund. In these circumstances, we cannot say that the chronological causation methodology applied by the superior court was an abuse of its discretion.

We also note that Patrick's SEP contribution benefitted Kimberly by eliminating the marital tax liability. In dividing marital property, courts must consider expenditures of separate property to obtain and preserve marital property.[58] Courts have discretion to credit the contributing spouse.[59] Thus, even if the refund should have been characterized as marital property, the superior court could have properly credited Patrick with the refund in light of the benefit Kimberly received. That Kimberly did not reap the full benefit of this use of Patrick's property does not render the superior court's characterization so inequitable as to warrant reversal. The superior court did not err in characterizing the 2001 federal income tax refund as Patrick's separate property.

## IV. CONCLUSION

For the foregoing reasons we AFFIRM with respect to the settlement funds, the marital home, the Mercedes–Benz, the tires and rims, and the 2001 tax refund. We also AFFIRM the superior court's finding concerning Knik Sweeping.

MATTHEWS, Justice, with whom FABE, Justice, joins, concurring.

I write separately because I believe this court should hold that there is a rebuttable presumption that transmutation of a separately titled house into marital property occurs when the house is used for a substantial period of time as the marital residence. We implied such a result in Chotiner v. Chotiner,

**55.** Miles v. Miles, 816 P.2d 129, 132 (Alaska 1991).

**56.** See Gilstrap v. Int'l Contractors Inc., 857 P.2d 1182, 1185 (Alaska 1993) (Burke, J., dissenting) ("[T]he relative insignificance of the claim when compared to the costs of a remand should spur this court to avoid a remand if at all possible.").

**57.** See Phillips v. Phillips, 290 S.C. 455, 351 S.E.2d 178, 180 (App.1986) ("An income tax refund is nothing more than a return of income. The returned income here is clearly marital property and the wife should have been awarded her equitable portion thereof.").

**58.** Ramsey, 834 P.2d at 809.

**59.** Id.

where we gave as an example of "an act or acts which demonstrate [a transmutative] intent" the act of the parties in using "the premises as their personal residence."[1] Further, immediately after we gave the personal residence example in *Chotiner*, we stated: "*Similarly*, placing separate property in joint ownership is rebuttable evidence that the owner intended the property to be marital."[2] The upshot of these statements is that the use of a house as a marital residence presumptively shows that the owner-spouse intends to donate it to the marital estate, in much the same way as placing property in joint ownership presumptively shows that the owner-spouse intends that the property so placed will be marital in character. I think that we should recognize this link in the present case.

Most common law presumptions are created because proof of the basic fact establishes the existence of the presumed fact to a sufficiently high degree of probability that it is fair and expedient to assume the existence of the presumed fact:

> Most presumptions have come into existence primarily because the judges have believed that proof of fact B renders the inference of the existence of fact A so probable that it is sensible and timesaving to assume the truth of fact A until the adversary disproves it.[3]

The connection between using a separately titled house as a marital residence for a substantial period of time, the basic fact, and transmutation of the house into marital property, the presumed fact, is very close. We recognized this in *Chotiner* in the language which I quoted above. Further, our decisions subsequent to *Chotiner* involving marital home transmutation claims have consistently found that transmutation took place.[4] Transmutation can be either the product of the intent of the owner-spouse or of the use of marital funds and efforts to maintain the property in question. Often, an owner-spouse will intend transmutation when a house is used for a marital residence. But even where this is not the case, marital residences are almost always maintained (including making mortgage payments) with marital funds and efforts. Creating a presumption recognizing this connection will tend to streamline divorce proceedings by eliminating much wasted effort by counsel and the courts. Further, the existence of such a presumption will demonstrate that it is only rarely that a marital residence is not transmuted and thus highlight the need to take special steps (such as pre-nuptial agreements or maintenance of the residence with separate property) in cases where the owner-spouse wishes to avoid transmutation.

1.  829 P.2d 829, 832–33 (Alaska 1992).

2.  *Id.* at 833 (emphasis added).

3.  2 McCORMICK ON EVIDENCE § 343, at 438 (John W. Strong, ed., 5th ed. 1999).

4.  *See e.g., Miller v. Miller,* 105 P.3d 1136 (Alaska 2005); *Keturi v. Keturi,* 84 P.3d 408 (Alaska 2004); *Green v. Green,* 29 P.3d 854 (Alaska 2001).