Robert L. KRIZE, Appellant/Cross–
Appellee,

v.

Judy N. KRIZE, Appellee/Cross–
Appellant.

Nos. S–11842, S–11862.

Supreme Court of Alaska.

Aug. 25, 2006.

Rehearing Denied Nov. 14, 2006.

482

Mila A. Neubert, Neubert Law Office, LLC, Fairbanks, for Appellant/Cross–Appellee.

Joseph W. Sheehan, Law Offices of Joseph W. Sheehan, Fairbanks, for Appellee/Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Robert and Judy Krize divorced after thirty-one years of marriage. The superior court ruled that the future income from a long-term lease of Robert's real property had been transmuted into marital property because Robert had arranged to have the lease income deposited in the parties' joint bank account. Because this evidence was insufficient to permit a finding that Robert intended all future lease income to be marital, it was error to apply the transmutation doctrine to future lease income and to classify the future income as marital. We consequently reverse that ruling. We also reverse as clearly erroneous the valuation of the parties' charter boat business. We therefore remand for further proceedings, including possible consideration of whether equity requires invasion of Robert's separate property.

## II. FACTS AND PROCEEDINGS

Robert and Judy Krize married in 1973 and were divorced in 2005.

Robert has operated a charter boat operation (Alaska Viking Cruises, or Viking) for nineteen years. Robert and Judy jointly own Viking through a corporation. The only year Viking made a profit was 2004.

Robert's income has come from investments and gifts from his parents. His principal source of income is a ground lease of Fairbanks property that Robert's parents gave him in 1999. Wells Fargo Bank owns a building on Robert's land and has a long-term lease on the property through 2025 and an option to extend through 2074. Only Robert's name is on the deed. The real property reverts to Robert when the lease expires. The lease currently earns $50,000 annually and the income will increase over time. Until the couple separated in 2004, the lease income was deposited in Robert and Judy's joint bank account, per a Notice of Assignment Robert executed in 1999.

Judy had worked in various positions with the Fairbanks North Star Borough; her employment provided insurance benefits for Robert. Judy took early retirement from her job in 1999. Her retirement income is $1,115 per month; she also receives health benefits. Judy has medical problems that may make it difficult for her to return to work, but the superior court found that she was capable of working. She occasionally helped run Viking.

The parties stipulated to the value of most of the marital property, but disputed the classification or valuation of some assets, including Viking, the lease, and two parcels of real estate in Mexico.

The superior court recognized that the Fairbanks real property was Robert's separate property, but determined that Robert had transmuted the income from the lease into marital property. Although it found the present value of the leasehold to be $730,000, it did not divide the present value between the parties, and instead awarded half the lease income to each party and permitted them to designate where their portion of the future lease income is to be deposited. The superior court noted that even if the lease income were not marital property, the court would have to reach a "very disproportionate" property division or would have to invade at least part of the lease income "to balance the economic impact of this divorce." Robert contends that it was error to apply the transmutation principle to the leasehold.

The court valued Viking at $50,000. Robert disputes that valuation on appeal.

The court also made a comment that, according to Robert, reveals that the court inappropriately considered Robert's future inheritance prospects when it divided the property.

## III. DISCUSSION

### A. Standard of Review

We review property division rulings for abuse of discretion.[1] Property division is a three-step process: "(1) determining what

1. *Malone v. Malone*, 587 P.2d 1167, 1167 (Alaska 1978) (noting "the court has broad discretion [to divide property] which will be interfered with on appeal only in cases of clear injustice").

property is available for division as marital property, (2) valuing the property, and (3) equitably allocating the property."[2] In the first step

> the trial court must determine what property is available for distribution, characterizing the property as either separate or marital, a determination we review under the abuse of discretion standard. An abuse of discretion occurs if the court considers improper factors, fails to consider relevant statutory factors, or assigns disproportionate weight to some factors while ignoring others. Marital property includes all property acquired during the marriage "excepting only inherited property and property acquired with separate property which is kept as separate property."[3]

The second step, placing a value on property, is a factual determination we review for clear error.[4] The third step, equitably allocating property, we review for abuse of discretion; "we will not disturb the allocation unless it is clearly unjust."[5] We review a finding of transmutation for clear error.[6]

### B. There Was Insufficient Evidence To Conclude that Robert Intended To Convert Future Lease Income into Marital Property.

█ The superior court ruled that the Fairbanks real estate leased to Wells Fargo is Robert's separate property, but classified the future lease income as marital. It concluded that because the lease proceeds were used for the couple's benefit, "history supports the finding that the lease itself—the proceeds of the lease were intended to be marital property." This had the effect of creating a usufructory interest in the property for Judy.[7] Although the court thus classified the real property as separate and classified the income as marital, neither party

argues that this result was conceptually problematic.

Instead the issue here is whether, as Robert contends, no evidence justified application of the transmutation doctrine to the lease income to be received after divorce. He argues that "[t]he only indication of transmutation that the court could point to was that the monies were directed to the parties' joint checking account." He asserts that this evidence only indicated that the lease proceeds for each month were "individual gifts" and did not indicate an intent to make a gift of all future revenue from the lease. Judy responds that "Robert's notice of assignment and his trial testimony ... demonstrate Robert's intent to change" the lease income into marital property. Judy cites Robert's trial testimony that his father gave him the property because the father understood "income from the lease, would go to benefit us—that is to say my wife, my son and I, by putting it in our account."

The Fairbanks property was quitclaimed to Robert by his parents in 1999. Robert directed that the lease payments be deposited into a joint checking account, but the deed to the real estate remained in his name only. Robert testified that he intended the lease proceeds to be marital only while the marriage lasted.

Judy never testified that Robert told her the lease income was marital. We assume from her testimony she would have so testified if Robert had said any such thing. Thus, when asked if she had "discussions with Bob about those lease payments," she simply responded: "Just that it was a nice secure future for us ... I had no idea that the bank lease was only in his name...." She also testified that "Bob's parents had been very generous with us throughout our marriage. And I always assumed it was just ... another wonderful gift." The superior

---

**2.** *Sampson v. Sampson,* 14 P.3d 272, 275 (Alaska 2000).

**3.** *Hansen v. Hansen,* 119 P.3d 1005, 1009 (Alaska 2005) (quoting *Lewis v. Lewis,* 785 P.2d 550, 558 (Alaska 1990)).

**4.** *Id.* (citing *Moffitt v. Moffitt,* 749 P.2d 343, 346 (Alaska 1988)).

**5.** *Id.*

**6.** *Id.* at 1013.

**7.** "Usufructory" is derived from the noun, "usufruct," which is "[t]he right of using and enjoying and receiving the profits of property that belongs to another." BLACK'S LAW DICTIONARY 1544 (6th ed.1990).

court heard her testimony and did not find that Robert had told her the lease income was marital.

■ As we have previously explained, "[t]ransmutation requires intent, as demonstrated through conduct, to change the character of property from separate to marital." [8] We have suggested several factors to help determine intent to transmute property: "[T]he property's use as a marital residence; its ongoing maintenance and management by the parties; the listing of its title in joint ownership; or the use of the non-owner spouse's credit to improve the property." [9] In the context of a commercial lease, the last three factors are potentially relevant.[10] But none of these circumstances is present here. First, there is no evidence Judy helped manage the leased property or the lease. Judy's testimony indicates she did not know any of the details of the lease, and Robert testified that his father did not want anyone but Robert "to have anything to do with [the property], except for the funds generated from it." Second, Judy presented no evidence suggesting that her credit was used to improve the property. Finally, the title to the property was never listed in joint ownership but only in Robert's name; since the lease itself has no title this fact is of minor importance.

The testimony of the parties is unhelpful in understanding Robert's subjective intent regarding future income from the lease. Judy's testimony that she merely "assumed" Robert's parents had given the real estate to both spouses permits an inference that Robert never expressed an intention to convert the lease into marital property. Judy's testimony is like that of the wife in *Harrower v.*

*Harrower* who "express[ed] her belief that the [property] would be part of the couple's retirement. But she acknowledged that [the husband] never told her that the property was partly hers." [11] We concluded there that the wife's subjective belief could not·support a finding that the husband intended to transmute the investment property.[12] We reach the same conclusion here.

Robert's testimony is similarly unhelpful. Robert presented uncontradicted testimony that he intended the revenue to be marital property only while the marriage lasted. But we have previously stated that this kind of "self-serving testimony is ordinarily not probative." [13] Robert also testified that his father wanted "income from the lease ... to benefit us." But that testimony does not make it clear whether Robert's father intended to benefit both Robert and Judy even if the marriage ended. It is therefore unclear what Robert's subjective intent was regarding the future lease income. Robert may have intended to share the future lease income or he may have intended to share only current lease income as it accrued.

Although Robert's intent may be ambiguous on this point, his conduct is less so. The fact that Robert directed that the lease payments be deposited in a joint account is not enough to show an intent to transmute future lease payments to marital property.[14] The lease income was paid into Robert's lease escrow, and Robert simply instructed the escrow agent to deposit the payments into the parties' joint checking account. Because Robert retained the right to stop contributing payments to the joint checking account, his actions can more realistically be viewed

8. *Schmitz v. Schmitz*, 88 P.3d 1116, 1125 (Alaska 2004).

9. *Harrower v. Harrower*, 71 P.3d 854, 858 (Alaska 2003) (holding that shares of stock in husband's name had not been transmuted) (citing *Green v. Green*, 29 P.3d 854, 858 (Alaska 2001)).

10. *See Sampson*, 14 P.3d at 276 (noting that although first factor only applies to real property, other factors may apply to both real and personal property).

11. *Harrower v. Harrower*, 71 P.3d 854, 858 (Alaska 2003).

12. *Id.*

13. *Abood v. Abood*, 119 P.3d 980, 986 (Alaska 2005).

14. We assume the individual lease payments became marital property when they were deposited into the joint bank account. *See Abood*, 119 P.3d at 987 (noting that separate property may become marital "if it is inextricably commingled with marital property"). But the question here is not whether money already deposited in the joint account was marital, but whether the right to receive future lease payments was marital.

as causing periodic gifts of accrued income than as a blanket assignment of future income. Given Robert's ambiguous statements of intent, and his conduct suggesting periodic gifts, there is no basis to infer that he actually assigned any future lease proceeds.

These circumstances are similar to those in *Sampson v. Sampson*,[15] in which the disputed asset was money held in a brokerage account only in the husband's name.[16] The husband periodically "used income earned from the A.G. Edwards account to contribute to the marriage."[17] The superior court ruled that this use of the funds transmuted the account into marital property; we held that there was insufficient evidence to conclude that transmutation was intended.[18] Simply placing funds earned from separate property in a joint account, whether on a regular basis as here, or periodically as in *Sampson*, is insufficient to evince intent to transmute separate property into marital property. Because there was no evidentiary basis for the finding that the lease was marital, it was an abuse of discretion.

■ Judy argues alternatively that even if the lease is not marital, Robert is equitably estopped from arguing otherwise because he told Judy that if she quit her job he would take care of her. She claims on appeal she "would never have terminated her employment with [Fairbanks North Star Borough] if Robert had told her that the lease income was not marital property." But Judy only testified that she assumed that the lease was marital property. Because there is no indication that Robert misled Judy with respect to the lease, her estoppel claim is groundless.[19]

We must therefore reverse the transmutation ruling and remand for further proceedings.

Our opinion resolves only the transmutation issue. It does not address the superior court's comments about allocating marital assets or invading the lease income. Even as it classified the future lease income as marital, the superior court commented:

> [I]f I wouldn't consider [the lease] as marital property at all, it would require me to do a very disproportionate division of the assets in favor of Ms. Krize . . . to fairly allocate the economic effect of this divorce. Or it would require me to invade at least a portion of the lease income in order to balance the economic impact of this divorce.

■ After classifying property as marital or separate, a trial court must decide whether equity requires invasion of separate property. It has "broad discretion" under AS 25.24.160(a)(4) to divide property and the equitable allocation of property will not be reversed unless clearly unjust.[20] On remand, therefore, the superior court may return to steps two and three of the property division process and reconsider the property's valuation and its equitable allocation.

Robert argues that the lease value found by the court was excessive because it included the value of his reversionary interest in the land. Our reversal moots this issue. If the superior court determines on remand that it is equitably necessary to invade the lease income, it should also consider whether there was an error in calculating its value.

### C. It Was Clear Error To Find Viking's Value To Be $50,000.

■ Robert next argues that the superior court erred in valuing Viking. In the superior court Robert suggested a value of $10,000

15. *Sampson v. Sampson*, 14 P.3d 272 (Alaska 2000).

16. *Id.* at 274.

17. *Id.*

18. *Id.* at 276.

19. "Equitable estoppel results from an assertion of a position, expressly or by implication, which is reasonably relied on by the opposing party to

his detriment." *Bibo v. Jeffrey's Rest.*, 770 P.2d 290, 293 (Alaska 1989).

20. *Keturi v. Keturi*, 84 P.3d at 408, 412 (Alaska 2004) (quoting *Harrelson v. Harrelson*, 932 P.2d 247, 250 (Alaska 1997)); *see also Silvan v. Alcina*, 105 P.3d 117, 123 (Alaska 2005) ("The superior court has broad discretion to make an equitable division of property; this court will overturn a division only if it is clearly unjust.").

and Judy suggested a value of $50,000. The superior court found the value to be $50,000.

Valuation is factual and will be reversed only for clear error.[21] In *Moffitt v. Moffitt* we noted that a finding is clearly erroneous "if it is unsupported by anything in the record."[22] As in this case, each party there expressed an opinion about the "good will" value[23] of the business and the two estimates diverged widely. We held that valuation must be based on "one or more principled methods of valuation," not mere speculation, and concluded that the court's valuation was clearly erroneous because it was unsupported by the record.[24] Owners may express their opinions of an asset's value, but must use a principled method of valuation.[25]

Judy asserts on appeal that the valuation technique she used "can be characterized as either a capitalization of net profits or a market value." When asked at trial how she had come to the $50,000 valuation, Judy testified that "Well, I just used the—the idea that this was an income producing asset and so only projected it out for five years and came up with $50,000." She based this value on the fact the business had earned a profit of about $10,000 the previous year, although in all prior years it had lost money.

Application of the "capitalization of net profits" method of valuation to this evidence does not produce a value of $50,000. Estimates of profits should be based on an average year. As one court has noted:

The validity of an opinion based upon capitalization of income would depend upon the selection of an income figure which was relatively stable, average and representative—of which there was reasonable probability of permanence or persistence in the future. An opinion based exclusively upon a highly variable factor ... would be without probative value.[26]

Because Judy's calculation was based on an atypical, rather than average, year, an opinion based on the capitalization of net profits method of valuation is unsupported by reliable evidence.

Judy's opinion does not pass muster under the "reasonable market value" method of valuation, either. Operation of the company would have required purchase of other assets, so any calculation of the company's reasonable market value would have to consider necessary investments and the potential rate of return on those investments. No evidence in the record would permit a conclusion that multiplying a single year's profits without examining the rate of return on potential capital investments can lead to a reliable estimate of the business's fair market value.

The record does not indicate what method the superior court applied in finding that Viking's value was $50,000. It noted that the value depended on an estimate of how well the tourism industry would do and how much effort Robert would put into the business. The superior court concluded: "How much profit [Robert] can turn over time depends upon a lot of what he chooses to do with it." The superior court may have based its valuation on an assumption the business was capable of making an annual profit of $10,000. But the only evidence potentially supporting

**21.** *Rice v. Rice*, 757 P.2d 60, 62 (Alaska 1988).

**22.** *Moffitt v. Moffitt*, 749 P.2d 343, 347 (Alaska 1988).

**23.** "Good will" value is "the amount by which the market value of a going concern exceeds the total value of its tangible assets." Principles of the Law of Family Dissolution: Analysis and Recommendations § 4.07 cmt. d (2002). The business has no tangible assets. The tour boat (M/V Valhalla) is titled as personal, not corporate, property and the parties agree that its value is $185,000.

**24.** *Moffitt*, 749 P.2d at 347–48.

**25.** An owner may express an opinion about the value of an asset (*see Schymanski v. Conventz*, 674 P.2d 281, 286 (Alaska 1983)), but the owner must still use a proper method of valuation before a court can rely upon the owner's opinion in a property division case. *See Moffitt*, 749 P.2d at 347. Judy's argument that Robert failed to object to her opinion of value misses the point. The issue is not whether her opinion was admissible into evidence (in which case failure to object would matter), but whether the evidence was legally sufficient for purposes of valuation.

**26.** *Shelby County R–IV Sch. Dist. v. Herman*, 392 S.W.2d 609, 614 (Mo.1965).

a value of $50,000 was Judy's flawed opinion. Consequently, no reliable evidence in the record supports the court's valuation. It would have been error either to accept as accurate Judy's speculation about the value of Viking's good will, or to base a valuation on a speculative assumption that Viking would realize stable future profits given the evidence of business losses in all but one year.

We therefore reverse the finding of Viking's value. In determining Viking's value on remand, the court should explain its method of valuation.

### D. The Superior Court Did Not Err by Considering the Likelihood of Future Inheritance.

■ Robert argues that the superior court impermissibly assumed Robert was going to inherit a large sum of money, and then relied on this assumption in dividing the property. Judy argues that because the court is required to consider each party's financial condition, it was proper to note Robert's expected inheritance. It is unclear whether the court gave any weight to a possible inheritance when it divided the property. Because we are remanding, and because the issue may arise again on remand, we choose to address it.

Our analysis of this question necessarily begins with the pertinent statutory language. Alaska Statute 25.24.160(a)(4) requires that the superior court consider

(A) the length of the marriage and station in life of the parties during the marriage;

(B) the age and health of the parties;

(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;

(D) the financial condition of the parties, including the availability and cost of health insurance;

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;

(G) the circumstances and necessities of each party;

(H) the time and manner of acquisition of the property in question; and

(I) the income-producing capacity of the property and the value of the property at the time of division.[27]

The requirement that the trial court consider the "circumstances and necessities"[28] of each party is fairly broad and open-ended. Being named as beneficiary in a parent's will could be considered a "circumstance" of a party. Moreover, "the financial condition of the parties"[29] might encompass each party's long-term financial condition.

The language of the statute—the fact that the factors are all phrased in the present tense—suggests that the court is to look only to present financial condition and present circumstances and necessities. But being named a beneficiary in a will could be treated either as a present circumstance or as a future interest which may or may not ever vest.

Because the statutory language does not explain how future inheritance should be regarded in the context of property division, we examine the issue according to generally accepted common law principles.

Our previous cases do not provide an answer. Our only previous case to discuss this general topic concerned a superior court's denial of a request to change an alimony order. We there explained:

> Homer maintains that changes in circumstances since the judgment was entered make prospective application inequitable.

---

27. The legislative intent provides little guidance as to interpretation of this section. The intent section of the Act states that "the factors codified are intended to restate the principal factors found in case law, not to change them, affect the interpretation given to them, or preclude

changes or additions to them by other court rulings." Ch. 130, § 1, SLA 1990.

28. AS 25.24.160(a)(4)(G).

29. AS 25.24.160(a)(4)(D).

He asserts that Teresa is expecting a substantial inheritance from her mother and argues that the court should have taken this into account before dismissing his motion. Teresa's inheritance, however, is not a fact. Its occurrence is speculative and therefore does not represent a changed circumstance.[30]

Our statement about the speculative nature of inheritance in *Burrell* is not determinative here because alimony is unlike property division in an important way. Since alimony is ongoing, either party can ask the court for a change if there is a significant change of circumstances; in that context the court can wait until a future interest vests. But property divisions once final cannot normally be reopened.[31]

Whether it is proper to consider prospective inheritance in a property division dispute is a difficult question that has split American jurisdictions. A majority of American jurisdictions regards expected inheritance as too uncertain to be used as a factor in property division.[32] But a substantial minority of jurisdictions permits or requires courts to consider inheritance as a factor in determining each party's financial condition upon separation.[33]

One leading treatise asserts that it is better to permit trial courts to consider the possibility of future inheritance when the inheritance is fairly certain:

> Where the beneficiary remains on generally good terms with the donor, and particularly where the donor is a parent or other close family member, it is a rare case where the expected gift or inheritance will completely fail to yield any benefits at all. The better position, therefore is that the court may consider an expected gift or inheritance as one relevant factor in dividing the marital estate.
>
> Of course, the weight of a future gift or inheritance as a division factor should depend heavily upon the degree of likelihood that benefits will actually be received.[34]

■■■■ Turner's preference contains some limitations on when prospective inheritance should be considered. Robert argues that permitting inquiry into potential inheritances

**30.** *Burrell v. Burrell*, 696 P.2d 157, 166 (Alaska 1984).

**31.** *See Lowe v. Lowe*, 817 P.2d 453, 456 (Alaska 1991) (noting that once property division is incorporated into a final judgment "relief may be granted only within the parameters of Civil Rule 60(b)").

**32.** *See, e.g.*, Colo.Rev.Stat. Ann. § 14–10–113(7)(b) (2005) (" '[A]n asset of a spouse' shall not include any interest a party may have as an heir at law of a living person ... nor shall any such interests be considered as an economic circumstance or other factor."); *Rubin v. Rubin*, 204 Conn. 224, 527 A.2d 1184, 1191 (1987) ("To base a division of property, which is not ordinarily subject to modification, upon the possibility of a future inheritance might often prove to be unfair in the light of subsequent events."); *McCloskey v. McCloskey*, 359 So.2d 494, 496 (Fla.App.1978) (noting "[s]aid inheritance is supposed to come to her by will when an elderly aunt dies, but the wife may die first, wills can be re-written, or the aunt may make an inter vivos disposition of the stock"); *In re Marriage of Ellinwood*, 59 Or.App. 536, 651 P.2d 190, 193 (1982) (noting that expected inheritance is "so uncertain as to justify its exclusion in the division of marital property").

**33.** *See, e.g.*, Iowa Code § 598.21(1)(i) (2005) (noting that in equitable division trial court should consider "economic circumstances of each party including pension benefits, vested or unvested, and future interests"); *Atkinson v. Atkinson*, 72 Ark.App. 15, 32 S.W.3d 41, 46 (2000) (noting "the fact that appellant is an only child and potential heir to a one-million-dollar estate coupled with the fact that he was the beneficiary of the aforementioned trust certainly suggests that he has opportunities for further acquisition of capital assets and income that are unavailable to appellee"); *In re Marriage of Benz*, 165 Ill.App.3d 273, 116 Ill.Dec. 336, 518 N.E.2d 1316, 1324 (1988) (noting that "there is generally no error where a court considers a future or anticipated inheritance when distributing property" because statute requires court to assess opportunity of each spouse for future acquisition of assets and income).

**34.** 2 Brett R. Turner, Equitable Distribution of Property § 6.91 (3d ed.2005). But Turner's analysis appears to be based on a typical statute which is quite different from Alaska's. He states that "most statutes speak of likelihood not certainty." *Id.* AS 25.24.160 does not mention the likelihood of acquiring future assets but appears to be more present-oriented than many statutes. *See, e.g.*, Iowa Code § 598.21(1)(i) (2005) (directing courts to consider even unvested future interests as part of the "economic circumstances of each party"). Turner's analysis is less convincing in Alaska than it might be in other jurisdictions.

would be a slippery slope that would swamp the courts with inquiry into "the wills and trusts of not only parents (as in this case), but aunts, uncles and the like." An absolute prohibition on considering prospective inheritance is unwarranted, but we think any such consideration (1) must be limited to immediate family members, (2) must be limited to inheritances that are not just possible but virtually certain, and (3) must treat the prospect as simply one factor and not give it inordinate weight. The likelihood of inheritance should not lead to a greatly disproportionate division of assets; but if inheritance is virtually certain, the court may give it some weight in considering how to divide the property.

We therefore conclude that it is not inherently improper for a court to consider the possibility of inheritance in some cases. Because property divisions cannot be reopened, however, courts must be cautious in using this factor.

■ On remand, the court should permit further discovery on this issue and on the extent to which Robert's interests have vested. Interests that have already vested may be considered as an asset of the beneficiary when the superior court divides the property.

### E. The Property Division Did Not Unfairly Favor One Party.

■ Robert argues that the superior court erred in awarding a disproportionate amount of income-producing assets to Judy. Robert notes that if neither he nor Judy works he will have income of $28,000 while Judy will have income of $40,000. Robert had testified that he wanted and intended to continue working, and the superior court assumed an income from the cruise business of at least $10,000 a year. Because the superior court may need to recalculate the division based on the non-marital status of the ground lease as well as the revaluation of the cruise business, Robert's objection to the current division (which may be substantially modified on remand) is moot.

■ Robert also argues that granting Judy one of the parties' two Mexican "Rancho Migrino" lots was erroneous. First, he argues it was erroneous because "[t]he only explanation for the court's decision to split the lots is that the court incorrectly presumed Robert had a better financial picture than Judy, because he stood to inherit his mother's estate." Judy argues that the absence of a valuation made the division necessary, otherwise the court could not be sure there was a fair overall division. Although the superior court did not explicitly state its reason for dividing the parcels, the court's comments suggest that it thought the fairest division was an equal division given the uncertain value of the parcels. We do not think that method was erroneous under the circumstances. On remand, the superior court may need to require a more accurate valuation if it is necessary for proper division.

■ Robert also argues that Judy had agreed before trial to let Robert have both Rancho Migrino properties; in exchange she would receive the Club Cascadas timeshare. (The stipulated value of the timeshare was $50,000, and the original agreed-upon value of the two Rancho Migrino lots was $59,400.) Judy then changed her mind, asking for both Rancho Migrino lots and the timeshare. Robert argues that the superior court should have followed the parties' agreement rather than awarding one of the Rancho Migrino properties to Judy.

Judy's pretrial property distribution spreadsheet indicates that the parties had agreed that both Rancho Migrino lots would go to Robert. At trial, however, Judy testified that a real estate agent in Cabo San Lucas had told her the value of Rancho Migrino lots had increased dramatically; Judy therefore asked the court to award both Rancho Migrino lots to her.

We assume Judy's pretrial spreadsheet reflected the agreement Robert describes. But we have held that "courts need not accept property settlements as controlling when the facts indicate an agreement was not made with full understanding."[35] Robert agrees

---

**35.** *Ford v. Ford,* 68 P.3d 1258, 1263 (Alaska 2003) (quoting *Notkin v. Notkin,* 921 P.2d 1109, 1112 (Alaska 1996)).

that the lots were never properly valuated. Because the properties had not been professionally appraised the parties were uncertain of the value. The original agreement was certainly not "made with full understanding" and the superior court did not abuse its discretion by failing to hold Judy to the pretrial understanding. The superior court therefore was within its discretion in granting Judy one of the Rancho Migrino lots.

Robert further argues that it was error to distribute the property without a proper valuation because Judy's decision to back out of her deal was based on her unsupported allegation of increased value. He argues that he could not contradict her assertion of increased value because he chose not to appraise the property in reliance on Judy's promise to let him have both Rancho Migrino lots. But Robert did not raise these arguments at trial.

 In a divorce proceeding "the trial court has wide discretion in deciding how to structure the property division," [36] but a court must be especially careful if it appears that one party has unfairly manipulated the process. Robert did not object to Judy's testimony that she had been told the property value had increased, even though her testimony was arguably hearsay. Neither on cross-examination nor at closing argument did Robert's attorney suggest that Judy's assertion of increased value was inaccurate. And in closing arguments Robert's attorney did not suggest that Judy had unfairly tricked him into forgoing a proper valuation. Robert instead argued at closing that Judy had agreed to let him have both Rancho Migrino properties, and that because the land was undeveloped it was better suited to Robert than Judy. Given Robert's failure to contest the issue of increased value, and his failure to argue that he had been induced to forgo valuation in reliance on Judy's promise, the superior court had no reason to believe that deviating from the parties' original agreement was inequitable. Under the circumstances—including the fact that there had been no proper valuation of the property—the superior court acted within its dis-

cretion in awarding one of the Rancho Migrino properties to Judy.

Finally, Robert argues that the superior court erred by not taking into account the cost of his health insurance, a cost he estimates to be "$6,000 per year or more." Judy counters that there was no evidence of cost and suggests that Robert's estimate is exaggerated. Alaska Statute 25.24.160(a)(4)(D) requires the court to consider "the availability and cost of health insurance" when dividing property. The divorce decree awarded Robert "$1.00 of Defendant Judy N. Krize's PERS benefits, so that Plaintiff Robert L. Krize qualifies to purchase health insurance through the PERS program." The court therefore did consider "the availability and cost of health insurance" when dividing the property. It made an award that will help ensure that Robert will be able to obtain affordable insurance. Robert has not demonstrated that his health care needs cannot be met by the award of marital property, or that failure to give greater consideration to the health care insurance issue was erroneous or clearly unjust. But because the cost of Robert's health insurance remains uncertain and because we are remanding for further proceedings, on remand Robert may offer evidence of his insurance cost. The superior court should take that evidence into consideration in its final division of property.

## IV. CONCLUSION

For these reasons the judgment is VACATED and the case is REMANDED for further proceedings in accord with this opinion.

---

**36.** *Silvan v. Alcina,* 105 P.3d 117, 124 (Alaska 2005).