Troy R. KETURI, Appellant,

v.

Luciel J. KETURI, Appellee.

No. S–10536.

Supreme Court of Alaska.

Jan. 30, 2004.

Troy R. Keturi, pro se, North Pole.

Fleur L. Roberts, Law Offices of Fleur L. Roberts, Fairbanks, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Troy Keturi appeals several legal and factual findings made by the standing master and adopted by the superior court in connection with his divorce trial. We conclude that the superior court did not err in aggregating his past income for child support purposes, in finding that his earning potential would not be adversely affected by his physical condi-

tion in the immediate future, in characterizing a triplex held in Troy's name as marital property, or in determining there to be no debt on a duplex owned as marital property. We therefore affirm the decision of the trial court in these respects. However, we find the calculation of Troy's income for the year 1997 to be clearly erroneous and accordingly remand for recalculation of his child support obligation.

## II. FACTS AND PROCEEDINGS

### A. Facts

Troy and Luciel (Lucy) Keturi were married in Anchorage in July 1991 and had a son in August 1993. Troy and Lucy separated on August 1, 2000. They filed a child custody agreement in March 2001 under which it was determined that custody would be shared.

Troy is an electrician and part owner of Ray Electric, an electrical contracting corporation started by Troy's father, Ray, in 1967. Ray Electric is currently owned equally by Troy and his partner, Clyde Waller. Lucy is employed at Gottschalks as a security officer and is responsible for detecting shoplifters and dealing with internal fraud. She previously worked in a similar capacity at J.C. Penney.

In 1995 Troy was diagnosed with psoriatic arthritis. Troy's treating physician, Dr. Gayle Carpenter, explained that this is a degenerative disease which manifests itself as a skin rash accompanied by a destructive arthritis in which "the joints become[ ] inflamed and are broken down, eventually infusing and becoming immobile." As a result, Troy has trouble moving his arms, his neck, and his jaw and is sometimes unable to get out of bed at all.

Since his diagnosis, Troy has experimented with different types of treatment, none of which have yet been approved by his insurance company for psoriatic arthritis. These treatments include Enbrel, which Troy used for a year and a half at a cost of between $14,000 and $16,000 a year, and Remicade, which he was taking at the time of this appeal, at a cost of $2,500 per shot. He has borne these costs out of pocket due to his insurance company's refusal to cover them. At the time of trial, he was also taking steroids, which "have great effects," but his doctor had begun to taper the dosage because of the potential for damage to his body, including ulcers, osteoporosis, fractures, and autoimmune disease. Troy has also undergone surgery to drain excess fluid from his knee joints, and he has considered the possibility of joint replacement surgery. However, Dr. Carpenter has cautioned that, following such surgeries, some patients continue to experience decreased range of motion and some may experience rejection of the prosthesis.

Dr. Carpenter has also expressed concerns about Troy's level of physical activity, explaining that "his work capacity is severely limited by his arthritis and he's continued to work despite his ongoing pain and physical limitations." She cautioned that Troy could someday experience "almost total disability" as a result of the disease. Asked within how many years such disability would occur, Dr. Carpenter responded: "As little as two or three. As long as 10 or 15. It just depends on the medications."

### B. Proceedings

Superior Court Judge Richard D. Savell issued a temporary child support order on April 19, 2001, ordering Troy to pay Lucy $263.83 per month in child support pending a trial to resolve disputed issues, including Troy's earning potential. Judge Savell referred the case to Standing Master Katherine R. Bachelder for trial of the property and debt issues. Judge Savell specifically requested the master to report on "the identity and value of marital property and debts" and that she recommend a distribution. Trial took place on June 27 and 28 and July 17, 2001. Both parties were represented by counsel. Lucy testified on her own behalf. Troy, Dr. Carpenter, Clyde Waller (Troy's business partner), and Raymond Keturi (Troy's father) testified on Troy's behalf.

Master Bachelder made findings on several issues, as requested by Judge Savell. With respect to the calculation of child support, the master decided to average Troy's income over a four-year period, based on his

testimony that his annual income has fluctuated substantially. Because her decision was issued in September 2001 and she believed any projection of income through the end of that year would be speculative, the master averaged Troy's income for the years 1997, 1998, 1999, and 2000 to reach a base amount from which to determine what Troy's child support obligation should be from that point forward. The master determined Troy's average adjusted annual income to be $84,482. Based upon Civil Rule 90.3(b), the master calculated Troy's child support to be $892 per month.

The master also made findings regarding Troy's health and the impact of his psoriatic arthritis on his earning potential. Based on testimony from Troy and Dr. Carpenter, she concluded that, while Troy's condition would certainly limit his ability to perform manual labor within the next three to four years, it would not necessarily affect his income because he could shift his responsibilities from physical labor to management.

The master made findings regarding the four pieces of property owned by the Keturis, either jointly or as separate property. These four pieces of property were the marital home, a duplex purchased during the marriage, a triplex purchased by Troy before the marriage, and a shop used by the business. There was no dispute with respect to the marital home because the parties had agreed that Troy would remain in the residence and assume the remaining debt. Similarly, the master recommended that Troy's shop, which had never been used for a marital purpose, be considered the separate property of Troy and his business, Ray Electric.

With respect to the duplex, while the parties agreed that it constituted marital property and should be awarded to Troy, they disagreed as to whether it was purchased with a bonus or a loan from Ray Electric. The master concluded that given Troy's and his partner's ability to determine what, when, and how to pay themselves, their prior history of paying themselves bonuses and classifying them as loans for tax purposes, and the

lack of documentation of the purported loan at the time it was made, it was "more likely than not that the property was purchased with a bonus received by the husband and not a loan."

Next the master addressed the issue of the triplex purchased by Troy prior to the Keturis' marriage. Troy and Lucy agreed on the value of the triplex and debt owed on it, but disagreed as to its classification. Based on the testimony of the parties at trial, the master urged the superior court either to classify the property as marital or, in the alternative, to invade the property in order to accomplish an equitable distribution.

Finally, the master addressed the equitable factors involved in this case. She first observed that an equal property division would be appropriate in this case, despite Troy's greater earning capacity, because Troy's progressive illness would result in high medical costs and potential physical disability in the coming years. In order to reach an equitable distribution, the master concluded that Troy would have to pay Lucy $85,399, either by selling the duplex or triplex or by cashing in one or more retirement accounts. Whether the court designated the triplex as marital or separate property, the master recommended that the payment remain the same, given Lucy's limited earning potential as compared to Troy's. Concerning taxes, the master concluded that refunds should be divided equally but that Troy should pay any future tax debt.

Troy objected to several aspects of the master's decision. He challenged her decision to average four years of income to determine his child support obligation, and her findings that (1) Troy's illness would not necessarily affect his earning potential, (2) the money used to purchase the marital duplex was a bonus and not a loan, and (3) the triplex should be considered a marital asset. Troy also objected to the conclusion that he should assume any future tax debt but that any refunds should be divided equally.

Judge Savell considered Troy's objections and rejected all but one [1] in his Order Upon

---

1. The court rejected the master's recommendation that Troy assume any potential marital tax

debt but that any refund be split between Troy and Lucy. Instead, the court determined that

Master's Report. Judge Savell adopted the master's method of calculating Troy's income, explaining that it is within the discretion of the court to determine the best way to ascertain income for the purpose of making an initial child support determination. With respect to the remainder of Troy's objections, the court observed that "viewed in a light that favors upholding the Master's findings[ ] . . . they are not clearly erroneous." This order was entered on December 12, 2001 and on January 29, 2002 a final decree of divorce was signed by the court.

Troy appeals.[2]

## III. STANDARD OF REVIEW

█ Factual findings based on the evidence presented at trial will be set aside only if we determine them to be clearly erroneous.[3] The same standard applies to factual findings made by a standing master.[4] "A finding may not be set aside as clearly erroneous unless the reviewing court has a 'definite and firm conviction that a mistake has been made.' "[5] While it may often be the case that each party will have presented evidence at trial to support his or her position, it is not our role to weigh the evidence anew, but rather to determine whether the trial court's findings are supported by the record.[6]

█ We will not overturn a child support award unless the trial court abused its discretion in calculating the award.[7] This includes the court's decision to average a parent's past income to determine his or her child support obligation.[8] We will find an

abuse of discretion when we have "a definite and firm conviction, based on the record as a whole, that a mistake has been made." [9]

█ We review a trial court's property division to determine whether it was within the broad discretion granted to the trial court by AS 25.24.160(a)(4).[10] "[T]he trial court's findings that parties intended to treat property as marital are disturbed only if clearly erroneous. . . . The equitable allocation of property is reviewable under an abuse of discretion standard and will not be reversed 'unless it is clearly unjust.' " [11]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion by Averaging Troy's Income Over a Four–Year Period To Determine His Child Support Obligation.

Because of the variation in Troy's income from year to year, the master recommended that the court use an average of Troy's income over a four-year period to achieve a base figure from which to calculate his child support obligation:

> Due to the fluctuating nature of Mr. Keturi's income, the court finds it appropriate to average his income in years 2000, 1999, 1998, and 1997. The court has declined to project Mr. Keturi's income for 2001 where such a projection would be speculative. He has received bonuses from the company in addition to his wages in past years and may receive a bonus in 2001 depending on the success of the business.

Troy should be held to any debt that would be incurred and should be permitted to receive for his sole benefit any refund. This issue is not before us on appeal.

2. While he was represented by counsel at trial, Troy represents himself *pro se* on appeal.

3. *Brooks v. Brooks*, 733 P.2d 1044, 1051 (Alaska 1987).

4. Alaska R. Civ. P. 53(d)(2) ("In an action to be tried without a jury the court shall accept the master's findings unless clearly erroneous.").

5. *Brooks*, 733 P.2d at 1051 (citing *Williams v. Alyeska Pipeline Serv. Co.*, 650 P.2d 343, 347 (Alaska 1982)).

6. *Id.*

7. *Pugil v. Cogar*, 811 P.2d 1062, 1065 n. 5 (Alaska 1991).

8. *Id.* at 1066.

9. *Id.* at 1065 n. 5.

10. *McDaniel v. McDaniel*, 829 P.2d 303, 305 (Alaska 1992) (citing *Moffitt v. Moffitt*, 749 P.2d 343, 346 (Alaska 1988)).

11. *Harrelson v. Harrelson*, 932 P.2d 247, 250 (Alaska 1997) (quoting *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994)).

In adopting the master's recommendation, Judge Savell observed that "[w]hen a parent's future earnings are uncertain, the court may base its calculations on an average of past years."

Troy contests this decision, arguing that those four years represent the highest-grossing period Ray Electric has ever experienced and are not representative of his current or likely future situation. According to Troy, the decision overstates his income because Ray Electric's current main job is projected to run over bid and will likely result in a loss to the company, he and his partner overpaid themselves during those years based on inaccurate predictions of future jobs, and both he and the business are currently in a great deal of debt both to creditors and to the federal government. Based on these factors, Troy maintains that his wages in those years do not accurately reflect his future earning capacity, and therefore should not have been used as the basis for making a prospective determination of how much his child support payments should be.

In response, Lucy contends that the master's recommendation is well-grounded in our case law and is supported by the evidence at trial. She maintains that Troy presented no evidence to corroborate his claims that Ray Electric has not had a profitable job of significant size since 1998, that Ray Electric has no cash reserves, or that Ray Electric's current project is expected to run over bid. Instead, Lucy argues that the evidence reflects that Ray Electric had four large, profitable jobs in the works at the time of trial. In addition, she maintains that, during the course of the marriage, the business had accumulated valuable property and equipment, the value of which was awarded to Troy in the divorce. She also claims that Troy has always had the discretion whether to pay himself a salary or to reinvest profits in the business. Lucy contests Troy's claims about tax liability, arguing that any estimate of debt is speculative. Finally, Lucy notes that she and Troy had traditionally received in-kind income from Ray Electric in the form of vehicles, gas, personal credit cards, and improvements to their property which were not included in the income calculation.

▮ We agree with Lucy that this decision was not an abuse of discretion. The Commentary to Alaska Civil Rule 90.3 specifically contemplates situations such as this, providing that "[t]he determination of future income may be especially difficult when the obligor has had very erratic income in the past. In such a situation, the court may choose to average the obligor's past income over several years."[12] We have explained that the commentary "reflects an understanding that a single year's income may not be a reliable indicator of future earning potential where an obligor's income is highly variable."[13]

And we have held in a number of cases that income-averaging may be used to calculate a non-custodial parent's income where it has been erratic in the past.[14] Because Troy has admitted that his income does fluctuate depending on the state of the business, and because the evidence admitted at trial established as much, we do not believe the trial court abused its discretion in averaging Troy's income for the years 1997 through 2000 in order to determine his prospective child support obligation.[15]

**12.** Alaska R. Civil P. 90.3, Commentary III.E., 252 (2003).

**13.** *Yerrington v. Yerrington*, 933 P.2d 555, 557–58 (Alaska 1997).

**14.** *See, e.g., Yerrington*, 933 P.2d at 557 (stating that "[w]e have approved an income-averaging approach in calculating child support where an obligor parent demonstrates an erratic or fluctuating income"); *Renfro v. Renfro*, 848 P.2d 830, 833 (Alaska 1993) (noting that "[t]his court has approved of an averaging approach when a parent's future earnings are uncertain"); *Zimin v. Zimin*, 837 P.2d 118, 123 n. 9 (Alaska 1992) (explaining that "we believe that a three-year average would provide an accurate estimate of a parent's current earning capacity when a parent's income is subject to yearly fluctuations"); *Pugil v. Cogar*, 811 P.2d 1062, 1066 (Alaska 1991) (holding that superior court did not abuse its discretion by averaging father's prior income to determine his prospective child support obligation).

**15.** We note that Troy remains free to move for modification of the child support award should his future income fall by an amount which would result in a fifteen percent decrease in child support payments. Alaska R. Civ. P. 90.3(h)(1).

## B. The Superior Court's Treatment of the Master's Factual Findings

■ The superior court specifically requested the master to report on "the identity and value of marital property and debts" and to recommend a distribution. Troy objected to several of the master's findings prior to their adoption by the superior court. Alaska Civil Rule 53(d)(2) requires the court to "accept the master's findings unless clearly erroneous." Judge Savell adopted all of the master's findings but one, deeming them not to be clearly erroneous. We address the contested factual findings in turn.

### 1. The finding that Troy's earning potential will not be adversely affected by his illness in the immediate future was not clearly erroneous.

The master described Troy as "37 years old and in poor health. He has psoriatic arthritis, a progressive disease. The medications that work effectively are not yet covered by insurance and are very expensive. His doctor testified that he could be totally disabled within four years." With respect to his earning capacity, the master found:

[Troy] has a greater earning capacity than [Lucy]. However, [Troy] has a progressive illness that will cause him to have high medical costs and he will become physically disabled as early as four years from now unless new experimental drugs are approved. His earning capacity will not decrease immediately where he is a co-owner and shareholder and will not become involuntarily underemployed when he is no longer able to perform physical labor.

Troy argues that the court erred in concluding that his physical condition would not immediately affect his earning potential. Troy relies on the testimony of Dr. Carpenter, Clyde Waller, and Ray Keturi at trial to support his position that his condition is rapidly deteriorating and that it has already begun to affect his ability to work. He explains that he will only be able to continue taking steroids for a short period of time due to their potential side effects, that there are days when he is unable to get out of bed at all, and that he has experienced signs of depression as a result of his condition. Troy maintains that the court erred in two respects in determining that his illness would not affect his earning capacity: first, by failing to account for the fact that he will need to hire someone else to perform the physical work he is now unable to perform himself, and second, by neglecting to consider the impact of his diminished energy level and depression on his ability to work.

Lucy responds that while she has never disputed that Troy's physical ability to work has been limited, the trial court did not err in finding that his condition would not necessarily affect his income, given his part ownership of Ray Electric and his ability to focus on the managerial side of the business. She argues that because Troy and his partner determine their own jobs, there is no reason Troy cannot continue to receive a share of the profits as a manager. Given his position, Troy retains the ability to simply assign himself duties that do not require physical labor.

Troy admitted that he has been able to do some of the company's bidding and to supervise other employees, and that he is sometimes able to "walk around and supervise." However, he also argues that the amount of non-physical labor he is able to do does not justify his receiving a salary equivalent to Clyde's. Clyde's testimony corroborates Troy's statements that he is physically unable to do what he was previously able to, that other employees have had to pick up the slack for Troy, and that Troy has not been able to work as many hours as Clyde in the three years prior to trial.

However, the master did not find that Troy's condition was not serious, but only that should "the business continue to do well, Mr. Keturi will still receive his share of the profits and can earn wages as a manager." Based on Troy's ability to collect a share of the profits, his history of receiving "in kind"

---

We also note that Troy has raised no argument under Civil Rule 90.3(c)(1), which allows the court to make an exception in calculating a parent's income and support obligation where unusual circumstances are present. The Commentary cites as an example such circumstances as "health or other extraordinary expenses." Alaska R. Civ. P. 90.3(c), Commentary VI.B., 254.

income from the business regardless of how many hours he works, and his testimony that he remains able to perform certain work-related tasks, we do not believe the trial court's conclusion was clearly erroneous..

### 2. The master's calculation of Troy's income for the year 1997 was clearly erroneous.

With respect to Troy's income, one of the master's factual findings was clearly erroneous. The master's report states that Troy's 1997 income was $192,826. However, no evidence supports that figure. Troy testified at trial that he earned approximately $52,000 in 1997. At one point Troy was asked whether 1997 was the year in which he received a $60,000 bonus, and he responded affirmatively, but later changed that testimony to indicate that 1998 was the year he had received the bonus. Even had he received such a bonus in 1997—which he ultimately clarified that he had not—his income would have been $112,000, not $192,826.

■ Because Troy's testimony was the only evidence offered to the court with respect to his income in 1997, and because that evidence did not support the finding that his 1997 income was $192,826, we remand this issue to the superior court for correction of the error [16] and modification of Troy's child support obligation.

### 3. The master's finding that Troy purchased the duplex with a bonus from Ray Electric was not clearly erroneous.

Troy also contests Master Bachelder's finding that the $88,832.67 check written from Ray Electric's account, which was used to purchase the duplex, was a bonus rather than a loan. Troy argues that all of the evidence supports a finding that the money was a loan and not a bonus, and

that therefore the master's contrary finding must have been clearly erroneous.

■ During the trial there was a wealth of testimony regarding an incident in 1998 in which Troy and Clyde gave themselves bonuses of $60,000 each, but failed to pay taxes on the bonuses within three days as required by the IRS. In order to avoid paying penalties on top of the taxes, Troy and Clyde called the bonuses "loans" for accounting purposes. The following year, they added $60,000 to their calculated salaries, and promptly each paid $60,000 back to the company to repay the "loan" of the prior year.

From that incident, the master reasoned that the money used to purchase the duplex could have similarly been designated a loan after the fact to avoid liability in the divorce settlement. According to the master,

[g]iven this one proven incident of classifying a bonus as a loan, the court finds it more likely than not that the duplex was purchased by the husband with marital wages, or a bonus, and that there is no outstanding debt on the property. The only proof that the husband produced to show that he has a debt to pay on the duplex was a company check showing a payment of $88,832.67 to First National Bank of Anchorage. The court does not find this to be sufficient evidence of a debt.

Troy contests this classification, explaining that there is no evidence the money used to purchase the duplex was a bonus and not a loan. In the past, he argues, when he has taken a bonus, Clyde has received an identical bonus, and the two have declared the amount on their W–2s and paid the required taxes. Because he and Clyde were partners, he did not feel he needed a loan agreement at the time the money was removed from the business. Clyde testified that Troy asked if he could borrow money from the company to

---

16. While Troy did not raise this issue either in his objections to the master's report or in his appeal, and while we usually will not review issues not previously raised, we raised the issue *sua sponte* at oral argument in this case and later allowed Lucy's counsel to provide written references to the record to support the finding that Troy earned $192,826 in 1997. We have carefully examined the proffered record references in her response. They do not support the finding.

Given the similarity of the income figures found by the master for 1997 ($192,826, based on wages of $132,826 plus a bonus of $60,000), 1998 ($132,826, based on wages of $78,826 and a bonus of $60,000), and 1999 ($132,880, based on $192,800 minus $60,000 "to pay on 'loan' from 1998"), we conclude that the error is a "[c]lerical mistake[ ] in [a] judgment[ ][or] order[ ]" that we may correct "at any time of [our] own initiative." Alaska R.App. P. 519(a).

purchase the duplex. According to Clyde, "[Troy] said he would pay it back with interest and we agreed upon something like 6 percent or something like that." When asked whether he had any documentation of the "loan," Clyde referred to the check written out by Troy to First National Bank of Anchorage in the amount of $88,832.67 and explained that the check "plus a handshake is—with my partner—is a binding deal." When asked whether Troy had paid any of the money back, Clyde said he had not checked and could not remember since it had occurred over two years ago.

While Troy has conceded that he has in the past purchased supplies and machinery for his personal use on the business account which were neither classified as loans nor mirrored by Clyde, he argued that Clyde would usually do the same, such that their acquisitions would be about equal. Since Clyde did not spend a comparable amount of Ray Electric funds that year, Troy argues that the money used to purchase the duplex should not be considered a bonus.

There was ample testimony at trial regarding Troy's ability to classify distributions to himself and his partner as he wanted and to use company equipment for personal benefit without payment to Ray Electric. There was also testimony on the lack of documentation, payment book, or proof of repayments or attempts to repay the money. The record supports the master's finding that the duplex was purchased with a "bonus" from Ray Electric and not a loan, and that it therefore carries no outstanding debt. This finding is not clearly erroneous.

### C. The Superior Court Did Not Err in Dividing the Value of the Triplex Between the Parties.

Concluding that the evidence showed the parties' intent to treat the triplex as marital property, the master recommended that the superior court find that the triplex had been transmuted from Troy's separate property to marital property. In the alternative, the master recommended that the superior court invade the property in order to accomplish an equitable distribution.

█ Because we agree that the triplex was transmuted from separate to marital property during the course of the marriage, it is not necessary to reach the question whether balancing the equities requires invasion of the triplex.

The division of property in divorce is governed by AS 25.24.160(a)(4), which vests in the superior court the authority to provide:

for the division between the parties of their property, ... whether joint or separate, acquired only during marriage, in a just manner and without regard to which of the parties is in fault; however, the court, in making the division, may invade the property ... of either spouse acquired before marriage when the balancing of the equities between the parties requires it; ... the division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors:

(A) the length of the marriage and station in life of the parties during the marriage;

(B) the age and health of the parties;

(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;

(D) the financial condition of the parties, including the availability and cost of health insurance;

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;

(G) the circumstances and necessities of each party;

(H) the time and manner of acquisition of the property in question; and

(I) the income-producing capacity of the property and the value of the property at the time of division.

█ In *Wanberg v. Wanberg,*[17] we explained that under certain circumstances basic fairness will require that property held separately by one of the parties be included in a property division.[18] "One such circumstance is where the parties, by their actions during marriage, demonstrate their intention to treat specific items of property as joint holdings, even though the properties were separately held by one or another spouse prior to coverture."[19] We have identified four factors to be used in determining when such intent exists:

> (1) the use of property as the parties' personal residence, and (2) the ongoing maintenance and managing of the property by both parties, as well as (3) placing the title of property in joint ownership and (4) using the credit of the non-titled owner to improve the property.[20]

Application of this test varies by situation. While we have held that not all of these factors need to be present in order to support a finding that a couple intended to treat property as marital,[21] we have been careful to note that "[p]articipation by both spouses in the management and maintenance of the property will not automatically transform pre-marital into marital property. Rather, the participation must be significant and evidence an intent to operate jointly."[22]

In *Wanberg,* the couple had built a five-plex on property which had been separately owned by the husband prior to marriage.[23] Both spouses were involved in the negotiation of the loan secured to finance the construction.[24] Both collaborated on design decisions and construction of the rental units.[25]

In addition, the wife cleaned the apartments and common areas, advertised vacancies, showed apartments, and collected overdue rents.[26] As we recounted, "[t]he Wanbergs consistently combined their efforts in improving and managing the property, and used the building as their joint personal residence for nearly two years."[27] The wife also co-signed a loan against the property.[28] Under these circumstances, we concluded that the trial court had abused its discretion by failing to consider this property marital.[29]

In this case, the master characterized the triplex as marital property based on the intent of the parties to treat it as such. She found that Troy and Lucy had used the triplex as a marital residence for the first two years of their union and that their testimony supported the conclusion that Lucy had been actively involved in the management and maintenance of the property:

> The wife collected rent, cleaned between renters, assisted in finding renters, maintained the coin operated laundry room, and partially landscaped the property during the marriage. The wife had to borrow money from her parents to make one of the mortgage payments. The mortgage was paid out of the parties' joint checking account. The rental money from the triplex was deposited into the parties' joint checking account for the benefit of the marriage. After the parties moved out of the triplex, the wife continued to place ads in the newspaper to rent the units, handled the telephone calls, and cleaned between renters.

**17.** 664 P.2d 568 (Alaska 1983).

**18.** *Id.* at 571.

**19.** *Id.*

**20.** *Cox v. Cox,* 882 P.2d 909, 916 (Alaska 1994) (citations omitted); *see also Harrelson v. Harrelson,* 932 P.2d 247, 251 (Alaska 1997).

**21.** *See, e.g., Harrelson,* 932 P.2d at 251–52 (upholding finding that property acquired by husband alone could be considered marital where only first two factors were present).

**22.** *McDaniel v. McDaniel,* 829 P.2d 303, 306 (Alaska 1992).

**23.** 664 P.2d at 571.

**24.** *Id.*

**25.** *Id.*

**26.** *Id.* at 571–72.

**27.** *Id.* at 572.

**28.** *Id.*

**29.** *Id.*

These factual findings are sufficient to support the conclusion that Lucy's actions amounted to "an active interest in the ongoing maintenance, management, and control of the property."[30] In sum, the evidence showed that the parties lived together in the triplex for two years after their marriage, that Lucy participated in the ongoing maintenance and management of the property, and that marital funds were routinely expended in making the mortgage payments.[31] The parties evinced an intent to treat the triplex as marital property. Accordingly, the superior court did not err in concluding that the triplex was transmuted from separate to marital property during the course of the marriage. It therefore properly divided the value of the triplex between the parties.

## V. CONCLUSION

We AFFIRM the superior court's decision to average Troy's income over a four-year period in order to determine his child support obligation. We also AFFIRM the superior court's adoption of the master's factual findings that Troy's earning capacity would not immediately be affected by his illness and that the duplex was purchased with a bonus from Ray Electric. And we AFFIRM the superior court's adoption of the master's factual finding that the parties intended the triplex to be transmuted from separate to marital property. We REVERSE the finding that Troy's 1997 income was $192,826 and we therefore REMAND for a recalculation of Troy's child support obligation.

---

**30.** *Brooks v. Brooks,* 733 P.2d 1044, 1054 (Alaska 1987).

**31.** The mortgage payments made from a joint account are presumptively marital. *See Chotiner v. Chotiner,* 829 P.2d 829 (Alaska 1992) ("Placing separate property in joint ownership is rebuttable evidence that the owner intended the property to be marital.") Moreover, the triplex rents

that were deposited in the joint account were insufficient to pay all of the triplex expenses and the mortgage. The use of joint funds over a ten-year period to pay at least a portion of the mortgage expenses is strong evidence that the third *Wanberg* transmutation factor is satisfied here.