NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STANLEY P. KACHER, | ) | |
| | ) | Supreme Court No. S-15474 |
| Appellant, | ) | |
| | ) | Superior Court No. 3KN-12-00063 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| KATHY L. KACHER, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 1548 – July 22, 2015 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Charles T. Huguelet, Judge.

Appearances: Blaine D. Gilman, Gilman & Associates, Kenai, for Appellant. Shana Theiler, Walton, Theiler & Winegarden, LLC, Kenai, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices. Winfree, Justice, dissenting.

# I.   INTRODUCTION

In this divorce case, each spouse owned a separate residence before the marriage, and the spouses placed both properties in joint title during their marriage. In the property distribution, the superior court acknowledged the presumption that separate property placed in joint title becomes part of the marital estate. But the court found that the parties had intended to maintain separate economic identities and did not intend for

---

\*   Entered under Alaska Appellate Rule 214.

the properties to transmute into marital property. Because the record supports the court's findings regarding the parties' intent, we affirm. We remand, however, to allow the court to address a possible scrivener's error.

## II. FACTS AND PROCEEDINGS

### A. The Parties' Marriage And Separation

Kathy Kacher and Stanley Kacher (Stan) met in 2004 when Stan, who lived in California, stayed at Kathy's Anchor Point residence, which she was operating as a bed and breakfast. Stan returned to California, but he and Kathy continued to communicate. In 2006 Stan moved in with Kathy at her Anchor Point residence, and they married in July of that year.

At the start of their marriage, Stan was in his mid sixties and Kathy in her late forties. Both parties were previously married. Both were self-employed professionals — Stan as a real estate agent and appraiser, Kathy as an accountant. Both were relatively well established financially. And both brought real property to the marriage: Kathy owned the Anchor Point residence, and Stan owned a house in California.

Five years later the marriage was on the rocks. In December 2011 Kathy asked Stan to move out of the Anchor Point residence, and she moved to the basement apartment. The next month, while Stan was conducting appraisals out of town, Kathy moved Stan's personal property to a storage unit and changed the residence's locks. Stan filed for divorce the next day.

Both parties behaved poorly during the separation. In January 2012, only days after filing for divorce, Stan asked to return to the Anchor Point residence to retrieve some remaining personal belongings. Kathy gave Stan permission to enter the garage for his items, so long as he stopped by while she was away. But when Stan

retrieved his personal property, he also removed the starter relay from Kathy's car and cut her Internet and television cables.

Later in 2012 Kathy became suspicious that Stan was misrepresenting his financial situation to her and to the superior court, and she learned that he was storing business documents in a cargo trailer parked on a mutual acquaintance's property. Although the parties dispute the exact details of what happened next, Kathy concedes that she broke into the cargo trailer and took Stan's files and a computer. The files contained Stan's appraisal records, and Kathy testified that the records — along with other documents she possessed — revealed that Stan had underreported his income to the Internal Revenue Service (IRS) for years and was mischaracterizing his financial situation during the divorce proceedings.

## B.      The Properties In Dispute

### 1.      The Anchor Point residence

Kathy purchased the Anchor Point residence in 1990, owed about $37,000 on the mortgage at the beginning of the marriage, and finished paying off the mortgage before the parties separated. In 2008 Kathy quitclaimed the property to Stan and herself jointly. The parties dispute the reason for this change of title. Kathy testified that she placed the property in joint title only to take advantage of a senior-citizen tax exemption for which Stan qualified. Stan, while not disputing that the tax exemption was a factor, testified that Kathy also recognized his willingness to assist in maintaining the property. Stan contributed labor, funds, and building supplies toward improving the residence.[1]

Despite these improvements, the value of the Anchor Point residence fell sharply in September 2012, when heavy rains caused the coastal bluff on the property

---

[1]      Stan initially told the superior court in an affidavit that he had provided about $100,000 toward the improvements. On appeal he claims about $25,000, an estimate Kathy does not contest.

to erode suddenly, leaving the house about 15 feet from the edge of the bluff. At trial Stan's expert witness — a professional appraiser — testified that the property would probably be ineligible for mortgage financing because, at the current rate of erosion, the house would begin to collapse within 30 years.

### 2. The California residence

Stan purchased the California residence for about $45,000 at an estate sale in 1995. At trial, he described the house as initially being "about 300 square feet [and] in very poor repair," but he renovated it, increasing its size by 1,000 square feet and adding a 2,000 square-foot deck. Stan refinanced the mortgage on the California residence in March 2006 — only months before the marriage. The residence was valued at over $500,000 at the time, and Stan took out an additional $350,000 loan. He invested $100,000 of the loan proceeds in a business venture that ultimately failed and placed the remaining $250,000 in a personal bank account.

Stan again refinanced the mortgage in 2008 to reduce his monthly payments. In doing so, he placed the property in joint title with Kathy. The parties dispute the reason for the change of title. Kathy testified that Stan's income was insufficient for him to qualify for the refinance and that she agreed to take joint title and sign onto the loan solely to help Stan lower his mortgage payments. She further claimed that she "wanted nothing to do with that house." In contrast, Stan testified that he was capable of qualifying for the refinance on his own, that the parties were making joint financial decisions at that time, and that the change in title reflected the parties' marital status. But regardless of the reason for the change in title, Stan continued to pay the mortgage, taxes, and utility costs for the residence out of his separate account.

By the time of trial, the value of the California residence had fallen significantly. Kathy arranged an appraisal, and the property was valued at around $230,000. The parties stipulated to this value. Because about $346,000 remained on the

mortgage principal at the time of trial, the property had no equity and was about a $100,000 liability.

## C.    Legal Proceedings

Stan filed for divorce in January 2012.  The next day, he requested an order allowing him to reside at the Anchor Point residence during the pendency of the divorce.  Stan described the lockout as a "wrongful eviction," and argued that "if [Kathy] feels uncomfortable sharing the marital residence with [me], she should move."   Kathy responded by claiming that the house was her "sole separate property" and noting that Stan continued to own and maintain the California residence.  The superior court denied Stan's request and ordered him not to return to the Anchor Point residence.

Stan then asked the court to require Kathy to pay half of the mortgage payments on the California residence.  He characterized both the Anchor Point and California residences as marital property, claimed that he reported only $48,000 of gross income in 2011 compared to Kathy's $86,000, and asserted that he had "retired and no longer generate[d] income from his appraisal business."  Kathy responded by noting that Stan had always paid the mortgage on the California residence and arguing that Stan's income was "far greater than he purports."  The superior court granted Stan's motion and ordered Kathy to pay $1,192.88 per month to cover half of the California mortgage payments.

Stan also moved for an order requiring Kathy to return the files and computer she had taken after breaking into his cargo trailer.  In response, Kathy claimed she had taken these items because she needed evidence to prove that Stan was misrepresenting his income.  The court ordered that the items be kept by Kathy's attorney, who was required to allow Stan's attorney to inspect and copy the documents.

The superior court held a three-day bench trial.  In its memorandum decision and order, the court concluded that the Anchor Point residence was Kathy's

separate property and the California residence Stan's. The court also found that the Anchor Point home "could be sold to a cash purchaser for $150,000-$200,000."

Kathy moved for reconsideration or clarification of four issues, two of which are relevant to this appeal. First, she asked the court to require Stan to reimburse her for the mortgage payments she had made during the separation, characterizing the payments as interim spousal support and arguing that Stan had misrepresented his financial situation. Second, she asked that Stan be required to file amended tax returns reflecting any unreported income. The court granted both requests.

Stan raises a number of issues on appeal. He contests the superior court's characterizations of both residences as separate property. He challenges the court's valuation of the Anchor Point property. He objects to the requirements that he credit Kathy for mortgage payments and file revised tax returns. Finally, he argues that the court abused its discretion by failing to order Kathy to return the property she had taken from his cargo trailer.

## III. STANDARD OF REVIEW

The equitable division of marital assets involves a three-step process: "(1) deciding what specific property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably."[2] "[T]he first step, 'the characterization of property as separate or marital[,] may involve both legal and factual questions.' "[3] Whether the parties intended to transmute separate property into marital

---

[2] *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013) (citing *Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991); *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983)).

[3] *Id.* at 459 (quoting *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006)).

property is a factual question.[4]  "Findings of fact are reviewed for clear error, but whether the trial court applied the correct legal rule . . . is a question of law that we review de novo using our independent judgment."[5]  "The second step, valuation of assets, is a factual determination that we review for clear error."[6]  "We review the trial court's third step, the equitable allocation of property, for an abuse of discretion."[7]

"Superior courts have broad discretion . . . in fashioning a property division in a divorce action."[8]  "We review for abuse of discretion a superior court's decision whether to give a credit to a spouse for payments made to maintain marital property . . . ."[9]  The "consideration of possible tax consequences is within the trial court's discretion when distributing property."[10]  This court reviews mootness issues de novo.[11]

---

[4]    *See Green v. Green*, 29 P.3d 854, 857 (Alaska 2001) (applying clearly erroneous standard to transmutation findings).

[5]    *Beals*, 303 P.3d at 459 (quoting *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005)) (internal quotation marks omitted).

[6]    *Id.* (citing *Rodriguez v. Rodriguez*, 908 P.2d 1007, 1012 n.6 (Alaska 1995); *Doyle*, 815 P.2d at 368).

[7]    *Id.* (citing *Doyle*, 815 P.2d at 368).

[8]    *Laughlin v. Laughlin*, 229 P.3d 1002, 1004 (Alaska 2010) (citation omitted) (quoting *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994)) (internal quotation marks omitted).

[9]    *Berry v. Berry*, 978 P.2d 93, 95 (Alaska 1999) (citing *Rodriguez*, 908 P.2d at 1013).

[10]    *Fortson v. Fortson*, 131 P.3d 451, 461 (Alaska 2006) (citing *Dodson v. Dodson*, 955 P.2d 902, 909 (Alaska 1998)).

[11]    *Clark v. State, Dep't of Corr.*, 156 P.3d 384, 386 (Alaska 2007) (quoting
(continued...)

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err By Characterizing The Anchor Point And California Residences As Separate Property.

Stan's primary claim on appeal is that the Anchor Point and California residences were part of the marital estate, and that the superior court clearly erred by characterizing both residences as separate property. Kathy disputes this claim, arguing that the record supports the court's findings that the parties maintained separate economic identities and did not intend to transmute the residences into marital property.

Transmutation "occurs when a married couple demonstrates an intent, by virtue of their words and actions during the marriage, to treat one spouse's separate property as marital property."[12] In *Cox v. Cox* we listed four nonexclusive factors superior courts may consider when making this determination: "(1) the use of the property as the parties' personal residence, . . . (2) the ongoing maintenance and managing of the property by both parties, . . . (3) placing the title of the property in joint ownership[,] and (4) using the credit of the non-titled owner to improve the property."[13] We have clarified that "[a]pplication of this test varies by situation,"[14] and that "not all of these factors need to be present in order to support a finding that a couple intended to

---

[11]  (...continued)
*Akpik v. State Office of Mgmt. & Budget*, 115 P.3d 532, 534 (Alaska 2005)).

[12]  *Abood v. Abood*, 119 P.3d 980, 984 (Alaska 2005) (quoting *Schmitz v. Schmitz*, 88 P.3d 1116, 1125 (Alaska 2004)) (internal quotation marks omitted).

[13]  882 P.2d at 916 (quoting *McDaniel v. McDaniel*, 829 P.2d 303, 306 (Alaska 1992)) (internal quotation marks omitted) (citing *Chotiner v. Chotiner*, 829 P.2d 829, 833 (Alaska 1992)).

[14]  *Keturi v. Keturi*, 84 P.3d 408, 417 (Alaska 2004).

treat property as marital."[15] Ultimately, the *Cox* factors are meant to assist the superior court in making factual findings about the couple's underlying intent toward the property during their marriage.[16]

In *Rose v. Rose* we set out an alternative approach to distributing property "in marriages of short duration, where there has been no significant commingling of assets between the parties."[17] In such cases "the trial court may, without abusing its discretion, treat the property division as an action in the nature of rescission, aimed at placing the parties in, as closely as possible, the financial position they would have occupied had no marriage taken place."[18] But we have made clear that a trial court may apply *Rose* only when the parties' commingling of assets is truly minimal: "Equitably dividing one of a couple's assets makes sense; applying *Rose*'s rescission theory to one asset does not. The parties have either maintained largely separate economic identities, in which case application of *Rose* is permissible, or they have not."[19]

Here both Stan and Kathy argue that the superior court used the *Rose* rescission approach. We disagree. The court noted that it was "influenced by the *logic* of the *Rose* opinion" during its transmutation analysis, but the court correctly utilized the traditional equitable property division approach and made reference to the *Cox* factors. (Emphasis added.) Because there was significant commingling of assets, and because

---

[15]     *Id.*

[16]     *See Abood*, 119 P.3d at 984-87; *Cox*, 882 P.2d at 916.

[17]     755 P.2d 1121, 1125 (Alaska 1988).

[18]     *Id.*

[19]     *Pfeil v. Lock*, 311 P.3d 649, 653 (Alaska 2013) (alteration omitted) (quoting *Morrissette v. Kim*, Mem. Op. & J. No. 1267, 2006 WL 3334056, at *2 n.12 (Alaska Nov. 15, 2006)) (internal quotation marks omitted).

the court relied on the equitable property division approach to distribute the parties' other assets, it would have been inappropriate to apply *Rose* rescission to these two specific properties.

### 1.    The Anchor Point residence

The superior court characterized the Anchor Point residence as separate property. The court recognized that Stan and Kathy used the Anchor Point house as their marital residence, but it found that Kathy "persuasively testified that they always considered it to be 'Kathy's home' " and "always considered the home in California to be [Stan's]." Though the court acknowledged that Kathy had shared at least some responsibility for maintaining and managing the Anchor Point residence with Stan, who "contributed labor, funds, and building supplies" to improve the house, the court found that Stan's contributions paled in comparison to the investments Kathy had made throughout her ownership of the home: "[Kathy] owed very little on the home at the time of the marriage and paid off the remainder of the mortgage [by] making payments with income from her business and using her separate bank account." And the court found that the parties had placed the property in joint title "mainly [as an] administrative convenience" — so that Kathy could "avoid taxes."

Stan argues that the Anchor Point residence should have been characterized as marital property, and he cites the *Cox* factors to contest the superior court's analysis. He points out that the parties' use of the Anchor Point residence as their marital residence was a factor that favored a finding of transmutation. He contends that the court erred by minimizing the importance of his improvements to the property. He argues that avoiding taxes was not an administrative convenience sufficient to overcome the joint-title presumption. And he claims the court should have found that he "utilized his credit to improve the property" by charging expenses from his home improvement contributions to his credit card and business charge accounts.

-10-                                                                      *1548*

Stan is correct that two of the *Cox* factors lend support to his position: the Anchor Point property was the marital residence, and the parties' decision to place the property in joint title created a rebuttable presumption of transmutation.[20] But the superior court determined that Kathy had successfully overcome the presumption and that there were other considerations which indicated that the parties did not intend to transfer the property to the marital estate. As noted above, the court found that Kathy's testimony about the parties' intent was "persuasive,"[21] that her contributions to the maintenance and management of the property far exceeded Stan's, and that the decision to jointly title the property was done primarily to avoid taxes.[22] The record supports these findings.

Additionally, we reject Stan's argument that his use of credit cards to pay for home improvement expenses should have been a factor in the superior court's transmutation analysis. Stan cites no authority to support this claim, and we are unaware

---

[20] *See Beals v. Beals*, 303 P.3d 453, 461 (Alaska 2013) ("There is a clear presumption that jointly held assets are marital . . . ." (citing *Schmitz v. Schmitz*, 88 P.3d 1116, 1128 (Alaska 2004))); *see also Chotiner v. Chotiner*, 829 P.2d 829, 833 (Alaska 1992).

[21] *See Knutson v. Knutson*, 973 P.2d 596, 599-600 (Alaska 1999) ("It is the function of the trial court, not of this court, to judge witnesses' credibility . . . .").

[22] As Stan notes, the Kenai Borough's senior tax exemption is not available when "the property was conveyed to the applicant primarily for the purpose of obtaining the exemption." Kenai Peninsula Borough Code 5.12.105(D) (2014). But though we cannot condone tax evasion, this issue is not determinative. The ordinance provision could demonstrate that the parties had a reason to jointly title the property that was unrelated to the tax exemption, as Stan contends; alternatively, it could demonstrate that *both parties* were complicit in a tax evasion scheme. The superior court did not clearly err by concluding that the latter was more likely, especially in light of Kathy's testimony detailing Stan's attempts to involve her in a separate effort to conceal relevant financial information when applying for the refinanced mortgage on the California residence.

of any cases in which we have considered such an argument. We have typically evaluated the use of a non-titled party's credit in the context of traditional mortgage loans,[23] which are usually approved on a case-by-case basis and attach a legal burden to the mortgaged property. Credit card transactions do not share these characteristics and do not require the consent of the titled spouse, whose intent is an important consideration in any transmutation analysis. Moreover, the superior court already considered the transactions Stan cites under the "maintenance and management" *Cox* factor, and it would make little sense to weigh a home improvement purchase made by credit card more heavily than one paid in cash.

For these reasons, though we acknowledge that the characterization of the Anchor Point residence is a very close question, we conclude that the superior court did not clearly err by finding that the parties intended the residence to remain Kathy's separate property.[24]

### 2. The California residence

The superior court also characterized the California residence as separate property. The court noted that the parties had placed the residence in joint title, but it found that "[Kathy's] testimony that the titles on the property were changed for administrative convenience was persuasive and consistent with the parties' actions during the marriage." The court found that Stan "paid all mortgage payments using funds from his separate account" and "allow[ed] his adult daughter to live there rent free

---

[23] *See Beals*, 303 P.3d at 459-61; *Elliott v. James*, 977 P.2d 727, 732 (Alaska 1999); *Harrelson v. Harrelson*, 932 P.2d 247, 251-52 (Alaska 1997); *Wanberg v. Wanberg*, 664 P.2d 568, 572 (Alaska 1983).

[24] Stan also contests the court's valuation finding for the Anchor Point residence. Because we affirm the finding that the residence remained Kathy's separate property, we do not need to address this issue.

over the objection of [Kathy]." Additionally, the court found that the California residence was not the marital residence and that Stan was primarily — and perhaps solely — responsible for the ongoing management of the property.

Stan claims the superior court's characterization of the California residence as separate property was clearly erroneous. He argues that "Kathy viewed herself as having an equal role in [the] management of the property." He asserts that the parties' decision to refinance the residence together cannot be considered an "administrative convenience" sufficient to overcome the joint-title presumption. And he contends that the court failed to properly acknowledge the use of Kathy's credit to improve the property.

As with the Anchor Point residence, Stan is correct that the parties' decision to place the California residence in joint title created a rebuttable presumption that the property became part of the marital estate. But the superior court concluded that Kathy overcame this presumption. The record supports the court's findings that the property was not the marital residence, that Kathy had little to no role in maintaining and managing it, and that the parties placed the property in joint title solely to allow Stan to refinance his mortgage loan and obtain a smaller monthly payment. As discussed below, we reject Stan's attempts to challenge these findings.

Stan claims the superior court clearly erred by failing to recognize Kathy's efforts to maintain and manage the California residence. Though Stan concedes that he alone paid mortgage payments, property taxes, and utility costs, he asserts that "after the refinancing and placement of the property into joint title, Kathy viewed herself as having an equal role in [the] management of the property" by suggesting that he sell the property or collect rent from his adult daughter who lived there. We disagree. Stan points to no overt actions by Kathy that demonstrate any significant intent to maintain or manage the residence. Even if Kathy's statements to Stan urging him to sell the house or collect rent

from his daughter constitute *some* amount of participation in the management of the house, the superior court did not clearly err by declining to conclude that her participation was "significant and evidence [of] an intent to operate jointly."[25]

Stan next contends that the superior court clearly erred by characterizing the parties' efforts to refinance the property as an "administrative convenience" sufficient to overcome the joint-title presumption. Stan might be right that obtaining a lower monthly payment rate does not qualify as an administrative convenience under our case law, but we do not need to decide the exact definition of "administrative convenience" here. We have never held that an administrative convenience is the *only* way to rebut the joint-title presumption, and the record is replete with evidence that Kathy had no interest in obtaining a stake in the property. Kathy testified that she "wanted nothing to do with that house," and her actions throughout the marriage were consistent this testimony. Kathy did not contribute to the mortgage payments, taxes, or maintenance costs for the California residence; she did not live there; and she wanted Stan to sell it as quickly as possible. She further testified that she helped with the refinance only to help Stan lower his monthly mortgage obligation, and the court credited this testimony. We see no clear error in the court's findings on this issue.

Finally, Stan notes that the use of one party's credit to improve the other party's property is a factor that generally *supports* a finding of transmutation.[26] He also suggests that Kathy signed onto the second refinance for personal benefit because the

---

[25]     *Keturi v. Keturi*, 84 P.3d 408, 417 (Alaska 2004) (quoting *McDaniel v. McDaniel*, 829 P.2d 303, 306 (Alaska 1992)) (internal quotation marks omitted).

[26]     *See Cox v. Cox*, 882 P.2d 909, 916 (Alaska 1994); *see also Chotiner v. Chotiner*, 829 P.2d 829, 833 (Alaska 1992) ("[S]eparate real estate can become marital where the owner permits the non-owner spouse to lend her credit to improve the property . . . .").

property had about $100,000 in positive equity at the time. But while Stan is technically correct that Kathy's net worth increased temporarily at signing, his broader argument is unpersuasive in light of the circumstances. The property was declining in value at the time of the refinance, and Kathy — a professional accountant who wanted Stan to *sell* the property — would have recognized that there was no real benefit in seeking an interest in it. Accordingly, the superior court was not required to find that Kathy signed onto the second refinance for her personal benefit, or that the use of her credit under these circumstances revealed an intent to transmute the property.

As we noted above, the "[a]pplication of [the transmutation] test varies by situation."[27] Given the unusual facts of this case, we conclude that the superior court did not clearly err by finding that the California residence remained Stan's separate property.

## B. The Superior Court Did Not Abuse Its Discretion By Ordering Stan To Credit Kathy For Her Interim Spousal Support Payments.

In March 2012 — nearly a year before the trial — Stan asked the superior court to order Kathy to assist him with one-half of the mortgage payments for the California residence. The superior court granted this motion. In Kathy's post-trial motion for reconsideration, she asked to be reimbursed for these payments, which she characterized as interim spousal support. Kathy argued that Stan made "false and misleading statements" in his request for assistance when he claimed that he was retired and relying primarily on Social Security payments. The court granted Kathy's motion for reconsideration and ordered Stan to reimburse her for all payments made under the mortgage payment order. The court concluded that it "was mistaken as to [Stan's] financial condition when spousal support was ordered" and that "[c]redit will help balance the equities."

---

[27] *Keturi*, 84 P.3d at 417.

Stan argues that this post-trial order was an abuse of discretion. He contends that his spousal support motion was factually accurate because he was not working at the time he submitted his brief and began working again several months later. He also claims that Kathy's estimation of his potential earnings was exaggerated and that the superior court's findings on the matter were insufficient to support its reimbursement order.[28]

In her appellate briefing, Kathy reiterates the points she made to the superior court. She argues that Stan failed to disclose a significant amount of income he earned during the marriage. She notes that, regardless of whether Stan's representation of income was technically accurate when he filed his spousal support motion, there is little doubt that he misinformed the court about his post-separation income later in the proceedings.[29] And she cites *Hanson v. Hanson*, where we held that when "it becomes evident that the spouse granted interim fees was, in fact, able to bear these costs, then an offset for these payments is an appropriate exercise of the trial court's broad discretion in matters involving interim support."[30]

We see no abuse of discretion in the superior court's reimbursement order. Kathy is correct that parties of comparable economic situations and earning capacities should bear their own costs, and in *Hanson* we affirmed the reimbursement of an interim

---

[28]    *See Stanhope v. Stanhope*, 306 P.3d 1282, 1293 (Alaska 2013) ("When one spouse has made payments to maintain marital property after separation, a trial court is required to make factual findings as to whether a credit is appropriate.").

[29]    In a brief submitted *after* he restarted his appraisal business, Stan continued to claim that he was relying "almost entirely upon social security payments of approximately $1,055 per month." But according to evidence presented at trial, Stan earned approximately $22,000 during the summer of 2012. That income, earned over a mere six weeks, was almost double his Social Security income for the entire year.

[30]    125 P.3d 299, 309 (Alaska 2005).

spousal support order without any finding that the spouse receiving the support had intentionally misrepresented her income.[31]  Here the court's finding that it was "mistaken" as to Stan's financial condition is supported by the record, which shows that Stan had significant post-separation earning potential, chose to return to the workforce in the summer of 2012, and failed to disclose this change in circumstances while continuing to represent to the court that he was relying "almost entirely" on Social Security benefits.  Though Stan's misrepresentation of income made the reimbursement order particularly reasonable, it was sufficient that the court "had not been aware of the full extent of [Stan's] assets when it made the original award and that evidence at trial demonstrated that [he] had not been in need of interim aid."[32]

### C.     The Superior Court Did Not Abuse Its Discretion By Ordering Stan To Prepare And File Amended Tax Returns.

In her motion for reconsideration, Kathy asked the superior court to order Stan to file revised tax returns for the years the parties filed joint returns.  The court granted this request and ordered Stan to file amended tax returns to include any unreported income.  The court also ordered that "[a]ny tax consequences and penalties related to [Stan's] understatement of income shall be the responsibility of [Stan]."

Stan claims that the order to file amended tax returns was an abuse of discretion.[33]  He argues that the superior court's decision was punitive, at least regarding

---

[31]     *Id.* at 309-10.

[32]     *See id.* at 303.

[33]     Stan also claims that "[i]t is not at all clear what Kathy's status with the IRS was" following the D.C. Circuit's affirmation of a federal district court's suspension of the licensed tax preparer program in January 2013.  *See Loving v. IRS*, 742 F.3d 1013, 1015 (D.C. Cir. 2014) ("[T]he IRS's statutory authority under [31 U.S.C. § 330] cannot be stretched so broadly as to encompass authority to regulate tax-return preparers.").
(continued...)

tax years 2006 through 2009, because the IRS generally must conduct an audit within three years of a tax return's filing date. He asserts that "Kathy presented no explanation or authority to show why [his] purported under reported income would be considered fraud or a significant underreporting of income" — two exceptions to the three-year audit deadline.[34] But at trial Kathy testified that, when she reviewed Stan's appraisal records, she discovered that his income was *consistently* underreported. The superior court credited this testimony, and "a consistent pattern of not reporting income" can provide the basis for a tax fraud prosecution.[35] Moreover, according to evidence Kathy presented at trial, Stan's underreported income from 2007 to 2011 exceeded $5,000 per year — the amount that triggers the "substantial omission" exception to the three-year audit deadline.[36]

Stan also argues that the state trial court had no legal authority to order him to file amended federal tax returns, and he cites several cases from other jurisdictions to support this claim. But Stan exaggerates the breadth of these cases' holdings, which support only the more limited proposition that, because the Internal Revenue Code

---

[33]     (...continued)
However, he admits that "[e]arlier in the divorce, Kathy indicated she [was] an 'enrolled agent' rather than a licensed tax preparer," and Kathy confirms this in her briefing.

[34]     *See* I.R.C. § 6501(a), (c)(1), (e) (2012).

[35]     *See United States v. Schaefer*, 4 F.3d 679, 681 (8th Cir. 1993) ("Willfulness in a criminal tax case may be established by a consistent pattern of not reporting income. Moreover, whether an act was committed willfully may be inferred from the facts of the case." (citations omitted)).

[36]     *See* I.R.C. § 6501(e)(1)(A)(ii) ("If the taxpayer omits from gross income an amount properly includible therein and . . . such amount . . . is in excess of $5,000, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at anytime within 6 years after the return was filed.").

provides married individuals with the specific, federally protected choice of filing their federal tax returns jointly or individually, state courts may not override that right of election.[37] Contrary to Stan's suggestion, none of these cases holds that principles of federalism prevent state courts from ordering litigants to file amended tax returns. Indeed, in *Kane v. Perry*, one of the cases Stan cites, the Appellate Court of Connecticut explicitly held that although the state trial court lacked the authority to override a litigant's choice of filing a separate return, the court "ha[d] the authority to order a party to file a joint federal personal income tax return if there was a prior agreement between the parties to do so."[38]

Here the superior court did not override Stan's federally guaranteed right of election.[39] Instead the court ordered Stan to file amended tax returns to address and correct his unreported earnings. Because Stan has no federal right to underreport his

---

[37] *See Kane v. Parry*, 588 A.2d 227, 231 (Conn. App. 1991) (agreeing with plaintiff's claim that "the trial court lacks the authority to deprive her of the federal right to file a separate return"); *Leftwich v. Leftwich*, 442 A.2d 139, 145 (D.C. Cir. 1982) ("To sanction the trial court's effectively ordering a spouse to cooperate in filing a joint return would nullify the right of election conferred upon married taxpayers by the Internal Revenue Code."); *Teich v. Teich*, 658 N.Y.S. 2d 599, 599 (App. Div. 1997) ("Federal tax law . . . gives each spouse unqualified freedom to decide whether or not to file a joint return, [putting the decision] beyond the trial court's equitable powers."); *Matlock v. Matlock*, 750 P.2d 1145, 1145-46 (Okla. Civ. App. 1988) ("To permit the trial court to order a spouse to file a joint return would be tantamount to removing the right of election conferred upon married persons under the Internal Revenue Code."); *In re Lewis*, 723 P.2d 1079, 1080 (Or. App. 1986) ("[T]he court cannot order the parties to file either a federal or a state joint tax return.").

[38] *Kane*, 588 A.2d at 231 (citing *Wolk v. Wolk*, 464 A.2d 780, 782 (Conn. 1983)).

[39] The court's requirement that Kathy cooperate with Stan in filing the amended returns suggests that the court assumed Stan would again file jointly.

income to the IRS, his federalism argument is unpersuasive.  We affirm the superior court's order but remand to determine whether the court intended to omit tax year 2011.[40]

### D.    Stan's Claim Regarding The Return Of His Personal Property Is Moot.

In December 2012, after learning that Stan might be concealing income from her, Kathy broke into Stan's cargo trailer and took several boxes of files and a computer.  Upon discovering Kathy's actions, Stan asked the court to order the return of his property.  The court denied this request but required Kathy's lawyer to safeguard the items while making them available to Stan's lawyer for inspection and copying.  Stan argues that this was an abuse of discretion.

We conclude that this issue is moot.  We begin by noting that Stan's request for the return of his property was procedurally intertwined with an otherwise unrelated dispute over the parties' travel trailer.[41]   In the superior court's post-trial decision and order, the court tied the return of Stan's personal property — which would include his files and computer — to the resolution of the travel trailer issue.  The court concluded that Stan had

> retained [the travel trailer] in bad faith and in direct defiance to a court order.  [Stan's] testimony that weather prevented him [from] returning the trailer was not credible.  [Stan] will pay [Kathy] her actual attorney's fees relating to litigation of this matter.  *The payment must be made in full before [Kathy] will be required to return [Stan's] personal property remaining in her possession.*  (Emphasis added.)

---

[40]    The court order, which was drafted by Kathy's attorney, actually required Stan to file amended returns for the years "2006, 2007, 2088 [sic], 2009[,] and 2010"; the year 2011 is missing from the order.  This appears to be an oversight, as Kathy's briefing has consistently included the 2011 tax year.

[41]    Stan filed his request for the return of his property as a cross-motion to Kathy's request that the court enforce the parties' travel trailer stipulation.

Stan has not appealed Kathy's attorney's fees award. Therefore, if Stan has paid Kathy's attorney's fees as ordered, he should already be in possession of his items. If Stan has not paid Kathy's attorney's fees, he knows what he needs to do to have his property returned. And if Kathy is refusing to comply with the requirement that she return Stan's property after receiving her attorney's fees award, then Stan should take up this issue with the superior court.

## V.    CONCLUSION

We REMAND to allow the superior court to clarify the amended tax return order. We AFFIRM the judgment of the superior court in all other respects.

WINFREE, Justice, dissenting in part.

I would remand to the superior court for additional findings of fact regarding the possible transmutation of the two residences. If the superior court did not utilize a *Rose* rescission analysis,[1] then the court needed to explain its reliance on "separate monies" and "separate accounts" for the source of the properties' mortgage and maintenance payments. All income the parties earned during their marriage was marital,[2] and this court acknowledges the superior court's finding that Kathy used her post-marriage income to pay the Anchor Point mortgage and maintenance expenses. It is unclear whether Stan funded the California property from his separate account arising from the pre-marriage refinance of the property or simply used marital income. In my view tracing the funds is necessary before deciding whether the parties intended to transmute their separate property interests into marital property interests; absent that information, in what this court describes as "a very close question" on the Anchor Point property and the "unusual facts" of the California property, we should not affirm the superior court's decision that the parties intended to continue holding their properties separately.

---

[1]    *See Rose v. Rose*, 755 P.2d 1121, 1125 (Alaska 1988) (allowing, in marriages of short duration with no significant commingling of assets, property distribution "in the nature of rescission").

[2]    *See Young v. Kelly*, 334 P.3d 153, 162 (Alaska 2014) (explaining that "a salary is clearly marital property").